UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re FASTLY, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br>    ALL ACTIONS. | Case No. 20-cv-06024-PJH<br><br>**ORDER APPOINTING ANDREW ZENOFF AS LEAD PLAINTIFF AND APPROVING LEAD COUNSEL**<br><br>Re: Dkt. Nos. 29, 30, 36, 42, 48 |

Before the court is movant Andrew Zenoff's ("Zenoff") motion to consolidate two related securities actions, Betancourt v. Fastly, Inc., 20-cv-6024-PJH and Habib v. Fastly, Inc., 20-cv-6454-PJH, appoint Zenoff as lead plaintiff in the consolidated action, and approve Robbins Geller Rudman Dowd LLP as lead counsel. Dkt. 42. Also before the court is movants Ramiro Pineda's and William Feit's ("P&F") competing motion to consolidate the above actions, appoint P&F as lead plaintiffs, and approve Bragar, Eagel & Squire, P.C. as lead counsel. Dkt. 48.

Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court **GRANTS** Zenoff's requests for appointment as lead plaintiff and approval of his selected lead counsel. The court **DENIES** P&F's competing requests for such appointment and approval.

## BACKGROUND

On August 27, 2020, plaintiff Marcos Betancourt ("Betancourt") filed the instant putative securities class action against defendants Fastly, Inc. ("Fastly"), Joshua Bixby ("Bixby"), and Adriel Lares ("Lares") (collectively "defendants"). Dkt. 1 (Betancourt Compl.). At core, Betancourt alleges that defendants made false and misleading

statements in violation of the Private Securities Litigation Reform Act ("PSLRA") by failing to disclose Fastly's business relationship with "ByteDance," which, at the subject time period, served as the operating entity of "TikTok." According to Betancourt, that fact is material because the United States government had heavily scrutinized TikTok (a mobile app for making and sharing videos) as a means for potential espionage by China. Betancourt alleges that, because defendants omitted information about Fastly's relationship with ByteDance, shareholders purchased its common stock at "artificially inflated prices" between May 6, 2020 and August 5, 2020 (the alleged class period).

In his complaint, Betancourt alleges the following two claims:

- Violation of Title 15 U.S.C. § 78j(b) against defendants for making false and misleading statements. Id. ¶¶ 51-61.
- Violation of § 78t(a) against Bixby and Lares premised on the above referenced primary violations under § 78j(b). Id. ¶¶ 62-67.

On September 15, 2020, plaintiff Rami Habib ("Habib") filed his class action complaint against defendants. 20-6454, Dkt. 1 (Habib Compl.). The Habib complaint rests on materially similar facts and legal theories as those advanced in the Betancourt complaint. It also premises its securities claims on the same May 6, 2020 through August 5, 2020 class period.[1] On October 16, 2020, the court related Habib to Betancourt. Dkt. 27. On October 27, 2020, following a stipulation by the parties, the court consolidated the two related actions. Dkt. 53.

On August 27, 2020, counsel for Betancourt published notice of the Betancourt action detailing (1) its pendency, (2) the claims asserted, (3) the proposed class period, and (4) the right to move for appointment as lead plaintiff. Dkt. 43-1 at 2-3. The instant

---

[1] The only noteworthy difference between the two complaints is that the Betancourt action seeks to certify a class generally comprising all persons who purchased Fastly **common** stock, Betancourt Compl. ¶ 35, while the Habib action seeks to certify a class generally comprising all persons who purchased or otherwise acquired Fastly **securities** (without limitation), Habib Compl. ¶ 35. Given that the moving plaintiffs fail to meaningfully address this distinction in the instant motions, the court finds it immaterial for purpose of making its appointment determination.

motions do not indicate whether counsel for Habib published like notice of his action.

On October 26, 2020, six Fastly shareholders moved to consolidate Betancourt and Habib, to appoint each movant as lead plaintiff, and to approve his or her selected lead counsel. Dkt. 29 (Xinhua Wei motion); Dkt. 30 (Paul Worland motion); Dkt. 36 (Kalpesh Bhetia motion); Dkt. 42 (Andrew Zenoff motion); Dkt. 48 (P&F motion). Wei withdrew his or her motion on November 6, 2020. Dkt. 54. Bhatia filed a statement of non-opposition to Zenoff's motion on November 9, 2020. Dkt. 55. Worland failed to oppose Zenoff's or P&F's motion. Worland also failed to file any reply in support of his motion. Thus, only Zenoff's and P&F's motions remain in contest.

However, as noted above, the court consolidated Betancourt and Habib pursuant to the parties' stipulation one day after the above motions were filed. Dkt. 53. Thus, both Zenoff's and P&F's requests to consolidate those actions are moot. Only their competing requests for appointment and approval of counsel remain pending. The court considers each below.

**DISCUSSION**

**A.     Legal Standard**

The PSLRA provides that within 20 days after the date on which a securities class action complaint is filed,

> the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class—
>
> (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
>
> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class. 15 U.S.C. § 78u-4(a)(3)(A)(i).

Any class member, regardless of whether he or she has filed a complaint, may move for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). Within 90 days of

3

the published notice, "the court . . . shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." Id.

When selecting a lead plaintiff, the court must adopt a presumption that the most adequate plaintiff in any private action is the person or group of persons that—

> (aa) has either filed the complaint or made a motion [for designation as lead plaintiff];
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

This presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

The Ninth Circuit has characterized the PSLRA as "provid[ing] a simple three-step process for identifying the lead plaintiff" in a securities fraud case. In re Cavanaugh, 306 F.3d 726, 729 (9th Cir. 2002). The first step consists of publicizing the pendency of the action, the claims made, and the purported class period. Id. In the second step, the district court considers "the losses allegedly suffered by the various plaintiffs" before selecting a "presumptively most adequate plaintiff." Id. at 729-30. The court must view "the one who 'has the largest financial interest in the relief sought by the class' and [who] 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure'" as the "presumptive lead plaintiff." Id. at 730. At the third step, the court must "give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." Id.

The Cavanaugh court cautioned that applying the statutory scheme

> provides no occasion for comparing plaintiffs with each other on any basis other than their financial stake in the case . . . . So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job. Id. at 732 (footnote omitted).

**B.   Analysis**

    **1.   The Court Appoints Zenoff as Lead Plaintiff**

As a preliminary point, Zenoff and P&F filed their motions within 60 days of the notice published on August 27, 2020.  Given that, both movants satisfy the PSLRA's filing condition.  The court will determine which movant has a larger financial interest and whether that movant satisfies the typicality and adequacy requirements in turn below.

        **a.   Zenoff Maintains the Largest Financial Interest**

The PSLRA does not require the court to apply a particular method to determine a potential lead plaintiff's "financial interest." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). The Ninth Circuit has confirmed that construction, requiring only that the court adopt a rational method and apply it consistently.  Cavanaugh, 306 F.3d at 730 n.4 ("[T]he court may select accounting methods that are both rational and consistently applied.").  As neatly explained by Judge Gilliam, courts primarily measure financial interest in one of two ways. In re Lyft Sec. Litig., 2020 WL 1043628, at *3 (N.D. Cal. Mar. 4, 2020). The first metric "equate[s] financial interest with ***actual economic losses*** suffered." Id. (citing Perlmutter v. Intuitive Surgical, Inc., 2011 WL 566814, at *3 (N.D. Cal. Feb. 15, 2011) (emphasis added).  The second metric "equate[] largest financial interest with ***potential recovery***." In re Lyft Sec. Litig., 2020 WL 1043628, at *3 (emphasis added).

Under the economic loss metric, courts apply the so-called Lax-Olsten test.  Id. Under that test, courts consider the following four factors:

    (1) The number of shares purchased during the class period.

    (2) The number of net shares purchased during the class period.

    (3) The total net funds expended during the class period.

    (4) The approximate losses suffered during the class period.  Id.

Courts put the greatest weight on the fourth factor.  Id.

1  As this court recently noted, the potential recovery metric is more nuanced. Saint
2  Jermain v. Fluidigm Corp., 2020 WL 7342717, at *3 (N.D. Cal. Dec. 14, 2020). "Some
3  courts 'determine the number of net shares purchased during the class period and then
4  supplement this calculation with losses suffered as a result of selling share[s] during the
5  class period.'" Id. citing (Perlmutter, 2011 WL 566814, at *6). Other courts, relying on
6  the "retained shares method," examine "the shares purchased during the class period
7  and retained at the end of the class period and calculate[] the total net loss considering
8  *only* those securities. In re Lyft Sec. Litig., 2020 WL 1043628, at *4 (citing Mulligan v.
9  Impax Labs, Inc., 2013 WL 3354420, at *6 (N.D. Cal. Jul. 2, 2013) (emphasis added).

10  To further complicate matters, courts also recognize technical differences in
11  accounting for any share bought or sold during the class period. Under the so-called last-
12  in, first-out ("LIFO") accounting methodology, courts "calculate[] losses by assuming that
13  the first stocks to be sold are the stocks purchased most recently prior to that sale."
14  Atanasio v. Tenaris S.A., 331 F.R.D. 21, 27 n.5 (E.D.N.Y. 2019). Under the alternative
15  first-in, first-out ("FIFO") methodology, courts "assume[] that the first stocks to be sold are
16  the stocks that were acquired first." Id. Of course, the accounting methodology selected
17  may affect a movant's calculated "financial interest" in the event he or she held shares in
18  the subject company prior to the class period and sold such shares during that period. Id.
19  ("[C]ourts have preferred LIFO and have generally rejected FIFO as an appropriate
20  means of calculating losses in securities fraud cases . . . The main advantage of LIFO is
21  that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during
22  the class period due to the inflation of the stock price, whereas FIFO ... ignores sales
23  occurring during the class period and hence may exaggerate losses.").

24  In their opening brief, P&F do not explicitly propose a particular metric or method
25  to determine their financial interest. Instead, they vaguely request that the court apply
26  the LIFO accounting methodology to determine such interest. Dkt. 48 at 6, 11.
27  Collectively, P&F claim a total loss of $70,848. Id. To substantiate that claim, P&F
28  attach two tables. Dkt. 49-2. The first table shows that Pineda purchased 1,600 shares

6

of Fastly stock on August 5, 2020 and sold all such shares on August 7, 2020. Id. at 3. The second table shows that Feit purchased 1,000 shares of Fastly stock on August 4, 2020 and sold all such shares on August 7, 2020. Id. at 4.

In his opening brief, Zenoff also fails to expressly propose a particular metric or method to determine his financial interest. Instead, Zenoff generally asserts that he "acquired 138,000 shares of Fastly common stock" during the class period and "suffered" a $105,848.29 loss because of the alleged misconduct. Dkt. 42 at 6. To substantiate that assertion, Zenoff attaches a table showing dozens of Fastly share acquisitions and sales during the class period. Dkt. 43-3. That table also shows a handful of sales after the class period and summarizes his estimated losses from all such transactions. Id.

In his opposition to P&F's motion, Zenoff summarily reiterates his position that he has the largest financial interest. Dkt. 56 at 3 ("Here, with losses of over $105,000 during the Class Period, Mr. Zenoff clearly has the largest financial interest in the relief sought by the class, no matter how the Court determines the movants' financial interests."). Notably, Zenoff neglects any explanation showing that his financial interest is, in fact, greater than P&F's interest "no matter how the court" determines it.

In their opposition to Zenoff's motion, P&F assert that Zenoff failed to accurately calculate his losses under the LIFO method. Dkt. 57 at 7. They explain that "Zenoff's data claims he sold more shares than he owned—meaning he must have held shares before the Class Period." Id. According to P&F, "[w]hen stock purchases and sales are correctly matched using the accepted LIFO method of loss calculation and taking into account Zenoff's pre-Class Period holdings . . . Zenoff has a total Class Period *gain* of $150,898.16." Id. (emphasis in the original).

To substantiate their assertion, P&F rely on a declaration from their counsel, Melissa Fortunato, which attaches a "loss calculation chart" for Zenoff. Id. at 7-8. The chart details each Fastly share acquisition and sale by Zenoff during the class period. Dkt. 57-2. For each transaction, the chart details the number of shares purchased or sold, the price per share, whether a sale was "matched" or "unmatched," and the running

7

total of Zenoff's Fastly holdings at the time of each purchase and sale.  Id.

In their reply in support of their motion, P&F repeat that "Zenoff incorrectly calculated his loss, failing to account for pre-class period holdings, with a resulting **gain**, not a loss."  Dkt. 58 at 1-2.  Given that incorrect calculation, P&F assert, they "have the greatest financial interest with LIFO losses of $70,848."  Id. at 3.

In his reply in support of his motion, Zenoff asserts that P&F's calculation of his financial interest is "entirely premised on the incorrect assumption that Mr. Zenoff must have 'held shares before the Class Period.'"  Dkt. 59 at 2.  Zenoff argues that he "had no opening position of Fastly, Inc. securities," meaning (in financial talk), "he did not hold any Fastly securities when the Class Period began."  Id.  He further asserts that "his losses of over $105,848 are the same under both the last-in, first-out (LIFO) and first-in, first-out (FIFO) accounting methodologies."  Id.  Zenoff fails to explain that assertion (which is not obvious to the court) or attach a declaration attesting to the fact that he did not hold any Fastly common stock prior to the class period.

As detailed above, the movants fail to stake a position on the metric and method they use to measure their respective financial interests.  Given that, the court is left with the elusive task of inferring how they arrived at their claimed interests.  Based on Zenoff's near exclusive (and repeated) reference to his $105,848 loss, it appears that he relies on the actual economic loss metric and, more specifically, the Lax-Olsten test's fourth factor.

Unlike Zenoff, P&F did not sell Fastly shares during the class period.  Dkt. 49-2 at 2-4.  Instead, both purchased the subject shares near the end of the class period and then sold those shares after that period.  Id.  Further unlike Zenoff, both P&F invoke the so-called "90-day look back average" to measure the loss they purportedly suffered as a result of their post-class period sales.  Id.  Thus, it appears that P&F rely on the retained shares method to measure their recoverable loss.

Under the circumstances at hand, the court finds that both suggested methods are imperfect.  Instead, the court will opt for a third method, namely "[1] determine the number of net shares purchased during the class period and then [2] supplement this

8

calculation with losses suffered as a result of selling shares during the class period." Saint Jermain, 2020 WL 7342717, at *3.  This method will permit the court to fairly consider the different sorts of losses that both remaining movants purportedly suffered— *i.e.,* intra-class period losses for Zenoff and post-class period losses for P&F.

Taking that approach, the court finds that Zenoff maintains the largest financial interest in this litigation.  Critically, Zenoff provides evidence showing a $105,848 loss from his sale of Fastly stock that he acquired during the class period.  Dkt. 43-3 at 2-4.  Except for the sale of approximately 5,000 shares of common stock on August 6, 2020 and August 7, 2020, all such sales occurred during the class period.  Id. at 4.

As previously noted, Pineda provides evidence showing only two share purchases during the class period and a single sale of all such shares after that period.  Dkt. 49-2 at 3.  Similarly, Feit provides evidence showing only a single purchase during the period and a subsequent sale after that period.  Id. at 4.  Relying on an $89.71 90-day lookback average price, P&F collectively assert a $70,848 total loss from the 2,600 shares that they retained following the class period's expiration.  Thus, when supplementing for the loss purportedly resulting from his dozens of sales of Fastly shares during the class period, Zenoff has an approximately $35,000 greater interest in this litigation than P&F.

P&F's critique of Zenoff's calculation of his financial interest does not alter that conclusion.  Zenoff's evidence does not show that he held Fastly common stock prior to the class period.  While tedious, the court personally tallied Zenoff's dozens of transactions to determine (1) the total number of shares acquired by Zenoff during the class period and (2) the total number of shares sold by Zenoff (including those handful of sales after the class period).  Dkt. 43-3.  The total number of shares acquired (138,000) equals the total number of shares sold (138,000).  Because P&F's explanation that Zenoff sold more shares than he acquired during the class period is inconsistent with that tally, the court finds their assertion that he held shares prior to the class period meritless.

Moreover, as shown by P&F's own evidence in opposition to Zenoff's appointment, Zenoff's net acquisitions and sales of Fastly common stock during the class period never

1  fell below zero.  Dkt. 57-2 at 2-8 ("Running Total" column).  That evidence separately

2  supports the inference that Zenoff sold only those shares that he acquired during the

3  class period.  Thus, whether Zenoff relied on the FIFO or LIFO accounting methodology

4  when reaching his financial interest determination is irrelevant.

### b. Zenoff Satisfies the Typicality and Adequacy Requirements

Once the court has determined the plaintiff with the greatest financial stake in the lawsuit, it "must then focus its attention on that plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'"  Cavanaugh, 306 F.3d at 730 (emphasis in the original).  An opposing movant may rebut the presumption that another movant qualifies as the most adequate plaintiff only if the opposing movant shows that the presumably adequate plaintiff either will not adequately and fairly protect the class or is subject to unique defenses.  Id. at 729-30.

The typicality requirement focuses on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).  "The adequacy requirement is met if there are no conflicts between the representative and class interests and the representative's attorneys are qualified, experienced, and generally able to conduct the litigation."  Hurst v. Enphase Energy, Inc., 2020 WL 7025085, *5 (N.D. Cal. Nov. 30, 2020).

The court finds that Zenoff satisfies both Rule 23 requirements.  With respect to adequacy, the court does not see any evidence in the record suggesting that his interests are antagonistic to class members generally.  Quite the opposite, the magnitude of Zenoff's purported loss supports the inference that he has a tangible incentive to actively litigate this action and monitor counsel.

With respect to typicality, Zenoff provides evidence showing that he acquired 138,000 shares of Fastly common stock during the class period.  Dkt. 43-3.  On the

limited record before it, the court does not see any reason suggesting that defendants may raise any defenses unique to Zenoff or his transactions. While the evidence shows that Zenoff made multiple sales of his shares during the class period, neither P&F nor any other movant argue that such sales render him atypical. Again, based on the record before it, the court also does not see any reason to suggest that those sales make Zenoff atypical. Given the above, the court finds that Zenoff is the presumptive lead plaintiff.

No party attempts to rebut Zenoff's presumptive status as lead plaintiff. Cavanaugh, 306 F.3d at 730. Accordingly, the court appoints him as such in this action.

### 2. Appointment of Lead Counsel

The PSLRA mandates that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). "Although this power is subject to court approval and is therefore not absolute, it plainly belongs to the lead plaintiff." Cohen v. U.S. Dist. Court, 586 F.3d 703, 709 (9th Cir. 2009). "[I]f the lead plaintiff has made a reasonable choice of counsel, the district court should generally defer to that choice." Id. at 712.

Here, no party has objected to Zenoff's selection of Robbins Geller Rudman & Down LLP ("Robbins Geller") as lead counsel. The court is familiar with Robbins Geller's reputation and experience litigating securities class actions. Robbins Geller generally performs quality work. Given that, the court finds Zenoff's choice of counsel reasonable.

### CONCLUSION

For the above reasons, the court **GRANTS** Zenoff's motion for appointment as lead plaintiff and approves his selection of lead counsel. Dkt. 42. Given that the court has already consolidated Betancourt and Habib, the court **TERMINATES** any request to consolidate those actions as moot. The court hereby appoints Andrew R. Zenoff as lead plaintiff in this consolidated action and Robbins Geller Rudman & Dowd LLP as lead counsel. The court **DENIES** Pineda's and Feit's competing motion, Dkt. 48, as well as all withdrawn or abandoned motions, Dkts. 29, 30, 36.

**IT IS SO ORDERED.**

Dated: February 10, 2021

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge