# EXHIBIT B

2021 WL 4084572
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

CITY OF RIVIERA BEACH GENERAL EMPLOYEES
RETIREMENT SYSTEM, on behalf of itself
and all others similarly situated, Plaintiff,

v.

MACQUARIE INFRASTRUCTURE
CORPORATION, et al., Defendants.

18-CV-3608 (VSB)
|
Signed 09/07/2021

**Attorneys and Law Firms**

[Joseph Alexander Hood, II](#), [Jeremy Alan Lieberman](#),
Pomerantz LLP, New York, NY, for Plaintiff.

[John Erik Schreiber](#), Winston & Strawn LLP, Los Angeles,
CA, [Richard Walter Reinthaler](#), Winston & Strawn LLP, New
York, NY, for Defendants.

**OPINION & ORDER**

[VERNON S. BRODERICK](#), United States District Judge:

 **\*1** In this action, Lead Plaintiff Moab Partners, L.P.
("Plaintiff" or "Moab") asserts various securities law claims
against Defendant Macquarie Infrastructure Corporation
("Macquarie" or "MIC"), Macquarie Infrastructure
Management (USA) Inc. ("MIMUSA"), Barclays Capital
Inc. ("Barclays"), James Hooke, Jay Davis, Liam Stewart,
Richard D. Courtney, (Hooke, Davis, Stewart and Courtney
together known as the "Officer Defendants"), Robert Choi,
Martin Stanley, Norman H. Brown, Jr., George W. Carmany
III, Henry E. Lentz, Ouma Sananikone, and William H.
Webb (together with the Officer Defendants, "Individual
Defendants").[1] Plaintiff's claims center on its assertion that
MIC and the other Individual Defendants made "material
misrepresentations and omissions" about potential risks
facing what it characterizes as MIC's "most important
operating division," and specifically that Defendants were
"actively conceal[ing] [MIC's] exposure" to a soon-to-be-
effective environmental regulation. (CAC 1 & ¶ 1.)[2]

[1] MIMUSA, Barclays and Individual Defendants
Robert Choi, Martin Stanley, Norman H. Brown,
Jr., George W. Carmany III, Henry E. Lentz,
Ouma Sananikone, and William H. Webb are not
identified as defendants in the caption.

[2] "CAC" or "Consolidated Complaint" refers to
the Consolidated Class Action Complaint for
Violations of the Federal Securities Laws filed in
this action. (Doc. 56.)

Currently before me are various Defendants' motions to
dismiss Plaintiff's Consolidated Complaint. Because I find
that Plaintiff does not plausibly allege false statements or
omissions, nor does it allege facts from which to draw a
strong inference of scienter, Defendants' motions to dismiss
the Consolidated Complaint are GRANTED.

**I. Factual Background** [3]

[3] In evaluating a motion to dismiss in a securities
action, a court may consider "any written
instrument attached to the complaint, statements
or documents incorporated into the complaint
by reference, legally required public disclosure
documents filed with the SEC, and documents
possessed by or known to the plaintiff and upon
which it relied in bringing the suit." *See* [ATSI
Commc'ns, Inc. v. Shaar Fund, Ltd.](#), 493 F.3d 87,
98 (2d Cir. 2007). For the purpose of resolving
this motion to dismiss, I will consider such
documents, and I assume all well-pleaded facts in
the Consolidated Complaint, *see supra* note 2, to be
true, and draw all reasonable inferences in favor of
Plaintiffs, *see* [Koch v. Christie's Int'l PLC](#), 699
F.3d 141, 145 (2d Cir. 2012).

The relevant time period for all of Plaintiff's alleged claims,
the "Class Period," is February 22, 2016 to February 21, 2018.
(CAC ¶¶ 3, 41; Doc. 101 ("MIC MTD") at 12; Doc. 110
("MTD Opp.") at 10.)

**A. The Primary Defendants**

Defendant Macquarie is a publicly traded Delaware holding
company that owns and operates various infrastructure and
infrastructure-related businesses. (CAC ¶ 28.) Central to the
allegations in the Consolidated Complaint is what Plaintiff

calls Macquarie's "most important operating division," International-Matex Tank Terminals-Bayone, Inc. ("IMTT"). (*Id.* ¶ 1.) IMTT is a wholly-owned MIC subsidiary that operates large "bulk liquid storage terminals" within the United States. (*See id.* ¶¶ 1, 33.) IMTT's terminals handle and store various liquid commodities, most notably "petroleum," but also "biofuels, chemicals, and vegetable/tropical oil products." (*Id.* ¶ 63.) IMTT does not buy and sell petroleum or other liquid products; it is solely a service provider to those who have title to various liquid products and need those products stored and handled. (*Id.* ¶¶ 37, 63.)

**\*2** Just before the start of the alleged "Class Period" of February 22, 2016 to February 21, 2018, (CAC ¶¶ 3, 41; *see also* MTD Opp. 10), MIC's market capitalization was approximately $5.75 billion, with around 80,084,457 shares of common stock outstanding that had traded in the first quarter of 2016 at a high of $71.82. [4] Just before the close of the Class Period, MIC's market capitalization was still approximately $5.75 billion, with around 84,819,268 shares of common stock outstanding that had traded in the first quarter of 2018 at a high of $67.84. [5] By May of 2018, after the Class Period, MIC's market capitalization had declined to around $3.2 billion. [6]

[4]   *See* Macquarie Infrastructure Co., Annual Report (Form 10-K), at 51 (Feb. 23, 2016).

[5]   *See* Macquarie Infrastructure Co., Annual Report (Form 10-K), at 54 (Feb. 21, 2018).

[6]   *MIC Market Cap History*, https://www.marketcaphistory.com/mic/ (last visited Sept. 3, 2021).

Defendant MIMUSA acts as MIC's manager. (CAC ¶ 29.) Through a management service agreement with MIC, MIMUSA assigns its employees to work at MIC as MIC's officers. (*Id.*) MIMUSA is compensated based on how MIC performs financially, which considers factors including MIC's market capitalization. (*Id.* ¶ 58.)

Defendants Hooke and Stewart were both MIMUSA employees assigned to work as MIC officers; Hooke served as Chief Executive Officer ("CEO") of MIC from May 8, 2009 to December 31, 2017, and Stewart has served as Chief Financial Officer ("CFO") of MIC since June 2015. (*Id.* ¶¶ 29, 30, 32.) Since 2008, Defendant Davis has been MIC's Head of Investor Relations and a Vice President of MIC, (*id.* ¶ 31),

and Defendant Courtney has served as CEO and President of IMTT since February 2015, (*id.* ¶ 33).

## B. MIC's Business in No. 6 Fuel Oil

The disputes in this case arise out of MIC's business, through IMTT, in storing a category of refined petroleum known as "No. 6 fuel oil." (*Id.* ¶¶ 1, 109.) No. 6 fuel oil refers to a "group of heavy and residual fuel oils" that "are generally what is left in the bottom of the barrel at the end of petroleum refinement process." (*Id.* ¶ 81.) Because No. 6 fuel oil has various environmentally noxious qualities, including a relatively high percentage sulfur content compared to other oils, governments and other institutions with regulatory authority have sought to limit or ban No. 6 fuel oil's use for over a decade. (*See id.* ¶¶ 87–88, 91.) Regulation has led to declines in the usage of No. 6 fuel oil, though this "the decline in residual fuel oil usage [was] masked by increase in its use as a fuel for maritime bunkering." [7] (*Id.* ¶ 89.) Indeed, "large shipping vessels" were generally thought of as the main users of No. 6 fuel oil by the start of the Class Period. (*Id.*)

[7]   "In shipping, bunkering refers to the fueling of ships with marine (bunker) fuels used to power them, and also includes food and drinking water supplies for the crew." Marquard & Bahls, *Glossary, Bunkering (Marine Fuelling)*, https://www.marquard-bahls.com/en/news-info/glossary/detail/term/bunkering-marine-fuelling.html (last visited Sept. 3, 2021).

According to the allegations in the Consolidated Complaint, the use of No. 6 fuel oil was threatened by a pending regulation known as "IMO 2020." First adopted in October 2008 by the International Maritime Organization ("IMO"), the United Nations body charged with regulating global shipping, IMO 2020 sought to ban the use of fuels with a sulfur content of 0.5% or more by the beginning of 2020. (*See id.* ¶¶ 90–91.) Because No. 6 fuel oil "typically" has a "sulfur content" of closer to "3%," (*id.* ¶ 91), many believed "IMO 2020 w[ould] effectively eliminate the use of No. 6 fuel oil for global shipping," (*id.* ¶ 92; *see also id.* ¶ 99 (recounting the U.S. Energy Information Administration's "significantly lowered expectations for future" global use of products like No. 6 fuel oil)). At the same time, others believed that shippers might opt to continue using No. 6 fuel oil even after IMO 2020's adoption by "installing abatement technology such as scrubbers" that would remove sulfur content in excess of

regulations from emissions. (Schreiber Decl. Ex. O,[8] at 4 (explaining that "the production and supply of" higher sulfur fuels like No. 6 fuel oil "would need to continue until the day before" IMO 2020 "kicks in") (cited in CAC ¶ 97).) Since 2013, IMO 2020 has been mentioned in the securities filings of at least one publicly-traded fuel storage business; one of these filings states that IMO 2020 has the potential to "reduce demand for our products and services." (CAC ¶ 98.) On October 27, 2016, IMO 2020 was "formally fixed" to place a 0.5% cap on sulfur in fuels like No. 6 fuel oil, (*id.* ¶ 120), a fact that was "widely reported" and about which there was a plethora of market analysis, (*id.* ¶¶ 121–23).

[8]      "Schreiber Decl. Ex. ___" refers to the Declaration of John E. Schreiber in Support of the Motion to Dismiss and the exhibits thereto. (Doc. 104.) The Schreiber Declaration includes many of the public statements quoted or otherwise referenced in the Complaint. I may refer to these in resolving this motion. *See supra* note 3.

### C. Relevant Pre-Class Period Statements

**\*3**   Plaintiff identifies Defendants' first alleged statements relating to No. 6 fuel oil as occurring during a May 3, 2012 earnings call. (*Id.* ¶ 105.) Specifically, during this earning call, Hooke stated that due to the "shutter[ing]" and "idl[ing]" of certain "refineries in the Northeast," MIC expected "less short term demand for storage of heavy oil residual product in the Northeast," and that MIC "ha[d] a reasonable number of heavy oil tanks at" one of IMTT's main storage sites. (*See id.*; Schreiber Decl. Ex. B.) As a result, Hooke said, MIC "may" make "a one-off increase in capital expenditures to convert the heavy product tanks to service the clean product." (*Id.*) Hooke cautioned that MIC's approach was not to convert its tanks over right away, but to "wait-and-see" and evaluate what mix of petroleum products customers may want to store at its facilities. (*Id.*)

Defendants only referred to converting IMTT's "heavy product" storage tanks on two other occasions prior to the Class Period. On August 2, 2012, during an earnings call, Hooke reported that MIC did not "see an immediate need to convert large amounts of existing heavy oil storage" over to handle "clean product." (CAC ¶ 106.) Next, on a November 1, 2012 earnings call, Hooke said that MIC had, in "the past couple of months[,] ... concluded that it would be in IMTT's long-term best interest to begin to convert a portion

of the residual oil storage at Bayonne," one of IMTT's largest storage terminals, "to clean product storage." (*Id.* ¶ 107.)[9] Hooke added that converting storage capacity "from residual oil or six oil to" other product classes would require capital expenditures. (*Id.*)

[9]      *See also* Macquarie Infrastructure's CEO Discusses Q3 2012 Results - Earnings Call Transcript, Seeking Alpha (Nov. 5, 2014, 4:18 PM ET), https://seekingalpha.com/article/979731-macquarie-infrastructures-ceo-discusses-q3-2012-results-earnings-call-transcript.

### D. Mid-Class Period Statements

Defendants did not again "publicly discuss the storage of No. 6 fuel oil" until "near the end of the Class Period." (*Id.* ¶ 108.) For example, a few days after the IMO made a late October 2016 announcement that IMO 2020 would go into effect at the start of 2020, as it had previously publicly stated it would, (*id.* ¶ 120), MIC held a November 2016 earnings call and "did not mention IMO 2020," (*id.* ¶ 124). Speaking for MIC, Hooke did say that, based on MIC's customers' behavior around storage contracts, he thought "shippers and others probably" thought commodity prices "will not be either as low or as volatile as has been the case over the last couple of years." (*Id.* ¶ 124.) He then added "none of MIC's businesses are exposed directly to the price of crude oil or petroleum products." (*Id.* ¶ 124.) Next, during conferences held in May 2017, Davis stated that MIC's storage business had "no commodity exposure other than the very broad macroeconomic factors influencing supply and demand more broadly." (*Id.* ¶¶ 144–45.) By comparison, one of MIC's main competitors used its November 2016 earnings call to discuss the implications of IMO 2020 on the "storage of" "diesel and fuel oil." (*Id.* ¶ 128 (Chief Financial Officer for MIC's competitor stated " 'the implications for global imbalances of diesel and fuel oil' as a result of IMO 2020, which he said raised the questions 'what does it mean for the storage of the products?' and 'what we are doing ... as a business?' ").)

### E. The Offering

On November 13, 2016, Defendants announced that MIMUSA would hold a secondary public offering of 2,870,000 shares of MIC common stock, which represented about 40% of MIMUSA's holdings (the "Offering"). (*Id.*

¶ 131.) The Offering documents "did not discuss" No. 6 fuel oil or IMO 2020. (*Id.* ¶ 132; *cf.id.* ¶ 133 (mentioning a separate fuel distributor that discussed IMO 2020 as an "adverse condition" in its public securities filings).) Investors purchased "over $235 million of [MIC] common stock" through the Offering from the underwriter, Barclays. (*Id.* ¶ 132.) MIMUSA had previously sold "27.6% of its holdings" in MIC "in June 2015." (*Id.* ¶ 309.)

### F. The Epic Acquisition

**\*4**  Around August 2017, Defendants announced that MIC would acquire Epic Midstream ("Epic"), another operator of storage terminals, for $171.5 million. (*Id.* ¶ 153.) At the time, the Epic acquisition price represented less than 3% of MIC's market capitalization. *See supra* note 5 and accompanying text. Epic offered MIC diversity in its storage offerings as it "principally stored jet fuel," a business that would not be impacted by IMO 2020. (*Id.*) MIC paid for Epic "largely in shares of [its] stock," (*id.*), with stock representing about 72% of the acquisition price, (*seeid.* ¶ 155).

### G. MIC's Stock Downturn

At the end of the Class Period, on February 21, 2018, MIC announced that IMTT's utilization—the amount of its storage tank capacity actually contracted for use by IMTT's customers—had dropped to 89.6%. (*Id.* ¶ 170.) Previously, at the end of the second quarter of 2017, IMTT's utilization was 94%, (*id.* ¶ 150), and at the end of the third quarter of 2017, utilization had been 93.2%, (*id.* ¶ 170). MIC also announced that it had missed its financial projections and would be cutting its dividend guidance. (*Id.* ¶¶ 180–82.) [10]

[10]    Prior to this, MIC's stock's desirability was based in part on "its stable and growing dividend." (CAC ¶ 4.)

On February 22, 2018, MIC held an earnings call in which its new CEO, Christopher Frost, who had replaced Hooke, said that MIC's financial downturn was in large part due to the "structural decline in the 6 oil market." (*Id.* ¶ 184.) Frost said that "[i]n December [2017] and early January [2018]," many of IMTT's customers "terminated contracts for a significant amount of 6 oil capacity at IMT's facility in St. Rose" and even "shut down their operations and exited the industry." (*Id.* ¶ 185.) Frost called this sudden downturn "a surprise." (*Id.*)

That same day, MIC's stock price fell around 41%, from a price of $63.62 per share the previous day to $37.41.

### II. Procedural History

On April 23, 2018, Plaintiff City of Riviera Beach General Employees Retirement System began this securities fraud class action by filing its complaint. (Doc. 1.) On January 30, 2019, I granted a motion to consolidate this action with the related action numbered 18-cv-3744 because it "set forth substantially identical questions of law and fact," and I appointed Moab as Lead Plaintiff. (Doc. 52 at 2–3.) Moab then filed the Consolidated Complaint on February 20, 2019. (Doc. 56.) The Consolidated Complaint alleges violations of (i) Section 10(b) of the Securities Exchange Act of 1934 ("'34 Act") and SEC Rule 10b-5 against MIC and the Officer Defendants [11]—Count I (CAC ¶¶ 317–25); (ii) Section 20(a) of the '34 Act against MIMUSA and the Officer Defendants—Count II (*id.* ¶¶ 326–29); (iii) Section 20A of the '34 Act against MIMUSA—Count III (*id.* ¶¶330–35); (iv) Section 11 of the Securities Act of 1933 ("'33 Act") against MIC, Barclays, and the Individual Defendants—Count IV (*id.* ¶¶373–83); (v) Section 12(a)(2) of the Securities Act against MIC and Barclays—Count V (*id.* ¶¶384–92); and (vi) Section 15 of the Securities Act against MIMUSA and the Individual Defendants—Count VI (*id.* ¶¶393–98).

[11]    Although MIMUSA is listed in the caption for Count I, by stipulation filed April 4, 2019, Moab and Defendants MIC and MIMUSA agreed that the Consolidated Complaint does not name MIMUSA in Count I, but does name MIMUSA in Counts II, III, and VI. (*See* Doc. 83.)

The Individual Defendants filed their motion to dismiss and memorandum of law on April 22, 2019. (Docs. 100–101.) That same day MIC and MIMUSA filed their motion to dismiss, memorandum of law, and declarations with exhibits. (Docs. 102–104.) Barclays also filed its motion and joinder memorandum of law—joining in the arguments made by the other Defendants in their motions to dismiss—on April 22, 2019. [12] (Docs. 104–105.) Moab filed its opposition brief and declaration with exhibits on June 21, 2019, (Docs. 110–11), and Defendants MIC and MIMUSA filed their reply brief on July 22, 2019, (Docs. 112). The Individual Defendants filed their reply brief and reply declaration, (Docs. 113, 115), and Barclays filed its joinder to the replies of the other defendants on July 22, 2019, (Doc. 114).

[12] Barclays also filed a letter motion requesting oral argument on April 22, 2019. (Doc. 107.) By endorsement the following day, I informed Barclays that pursuant to my Individual Rule 4.J, I would inform the parties if I deemed oral argument necessary. (Doc. 108.)

### III. Legal Standard

**\*5** To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."

*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.

*Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion

to dismiss." *ATSI*, 493 F.3d at 99; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Federal Rule of Civil Procedure 9(b) requires a securities fraud claim to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This standard requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

The Private Securities Litigation Reform Act (the "PSLRA") also imposes a heightened pleading standard on securities fraud complaints. *See* 15 U.S.C. § 78u–4(b); *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700(PKC), 2012 WL 3957916, at \*7 (S.D.N.Y. Sept. 10, 2012) ("Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA."). To satisfy the PSLRA, a securities fraud complaint must " 'specify' each misleading statement"; "set forth the facts 'on which a belief' that a statement is misleading was 'formed' "; and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u–4(b)). Although a court ordinarily draws all reasonable inferences in favor of the plaintiff, the PSLRA "establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (internal quotation marks omitted).

### IV. Discussion

#### *A. Section 10(b) and Rule 10-b5*

##### 1. Applicable Law

###### a. Misstatements or Falsity

**\*6** Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraud in connection with

the purchase or sale of securities. *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Rule 10b-5(b) targets misleading disclosures, and Rules 10b-5(a) and (c) target deceptive conduct. *See SEC v. Lee,* 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010); *see also Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 129 (2d Cir. 2011) ("Section 10(b), in proscribing the use of a manipulative or deceptive device or contrivance, prohibits not only material misstatements but also manipulative acts." (citation omitted)); *United States v. Finnerty,* 533 F.3d 143, 148 (2d Cir. 2008) (" 'Conduct itself can be deceptive,' and so liability under § 10(b) or Rule 10b-5 does not require 'a specific oral or written statement.' ") (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 158 (2008)).

"To succeed on a claim under Section 10(b) of the Exchange Act and Rule 10b–5, 'a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.' " *Indiana Pub. Ret. Sys. v. SAIC, Inc.,* 818 F.3d 85, 93 (2d Cir. 2016) (quoting *ATSI,* 493 F.3d at 105). "A false statement was made with the requisite scienter if it was made with the 'intent to deceive, manipulate, or defraud.' " *SEC v. Frohling,* 851 F.3d 132, 136 (2d Cir. 2016) (quoting *SEC v. Obus,* 693 F.3d 276, 286 (2d Cir. 2012)).

The PSLRA, which amended the Exchange Act, provides for "a statutory safe-harbor for forward-looking statements." *Slayton v. Am. Express Co.,* 604 F.3d 758, 765 (2d Cir. 2010). Under the PSLRA, a forward-looking statement is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial." 15 U.S.C. § 78u-5(c)(1)(A). The safe harbor provision "requires dismissal if the plaintiffs do not 'prove that the forward-looking statement ... was ... made or approved by an executive officer with *actual knowledge* by that officer that the statement was false or misleading.' " *Slayton,* 604 F.3d at 773 (quoting 15 U.S.C. § 78u-5(c)(1)(B)).

## 2. Application

Plaintiff pleads a host of allegedly actionable misstatements and omissions. The crux of Plaintiff's argument is that the "statements were false and misleading" because MIC "concealed from investors that IMTT's single largest product ... was No. 6 fuel oil," which "constitute[ed] over 40% of [IMTT's] storage capacity" and which "faced a near-cataclysmic ban on the bulk of its worldwide use through IMO 2020." (MTD Opp. 28.) Accordingly, as Plaintiff frames the case, a key issue is whether "Defendants ha[d] a duty to disclose" the extent to which IMTT's storage capacity was devoted to No. 6 fuel oil. (*Id.* at 28–29.)

Section 10 "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 44 (2011). "A company has no duty to disclose information 'merely because a reasonable investor would very much like to know' that information." *S.C. Ret. Sys. Grp. Trust v. Eaton Corp. PLC,* 791 F. App'x 230, 234 (2d Cir. 2019) (quoting *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir. 1993)).

Nevertheless, there are two relevant situations where a company will be bound to disclose facts. The first is when a company or its officers makes a statement that is only a "half-truth[ ]," i.e. where a defendant's affirmative statement, albeit "literally true," "create[s] a materially misleading impression" due to defendant's choice to omit that information. *In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 239–40 (2d Cir. 2016) (collecting cases); *see, e.g., Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC,* 277 F. Supp. 3d 500, 513 (S.D.N.Y. 2017); *Meyer v. Jinkosolar Holdings Co.,* 761 F.3d 245, 250 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." (citation omitted)). As such, although many cases talk about how "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *Plumbers & Steamfitters Loc. 137 Pension Fund v. Am. Express Co.,* 15 Civ. 5999 (PGG), 2017 WL 4403314, at *13 (S.D.N.Y. Sept. 30, 2017) (quoting *Jinkosolar,* 761 F.3d at 250), *aff'd sub nom. Pipefitters Union Loc. 537 Pension Fund v. Am. Express Co.,* 773 F. App'x 630 (2d Cir. 2019), there is no "boundless" "duty" to "reveal all facts on the subject" just because a company or its officers speak on a subject,

*see id.* (internal quotation marks omitted). In particular, the statement made and the fact that allegedly should have been disclosed must share a reasonable level of specificity.

*Compare* 🚩 *Jinkosolar*, 761 F.3d at 247, 250 (finding an actionable half-truth where a public offering described specific "pollution abatement equipment ... to process, reduce, treat, and where feasible, recycle the waste materials before disposal" and commenting on the "environmental teams at each of our manufacturing facilities" while at the same time not disclosing "that the prophylactic steps were then failing to prevent serious ongoing pollution problems") *with* *Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 409–10 (S.D.N.Y. 2020) ("To the extent [the company] made any disclosures at all about its compliance measures, those disclosures were tentative and generic", not "a testament to the adequacy of [the company]'s compliance program" (internal quotation marks omitted)), *and* *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 513 (S.D.N.Y. 2017) (no actionable half-truth from statements describing a "global compliance program," "comprehensive policies and supervisory procedures," "mandatory compliance training," and "strong relationships with a global network of local attorneys" because these statements "did not describe specific regions, specific initiatives, or make any assurances of efficacy."); *see* *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 163 (S.D.N.Y. 2018) ("it is the specificity" of a statement that may require a defendant to speak more fully).

**\*7** The second relevant situation is when "a statute or regulation require[es] disclosure." 🚩 *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (citation omitted). One such regulation is "Item 303 of SEC Regulation S–K, 17 C.F.R. § 229.303(a)(3)(ii)," 🚩 *SAIC*, 818 F.3d at 88, which obligates a company to make a disclosure in its SEC filings "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." 🚩 *Id.* at 94 (quoting 🚩 *Stratte–McClure*, 776 F.3d at 101). To allege a violation of Item 303 sufficient to support a Section 10(b) claim, a plaintiff must allege, first, that some "trend, event, or uncertainty" was "actually know[n]" to a company's management "when [the company] files the relevant report with the SEC," 🚩 *id.* at 95, and second, that the omission in violation of Item 303 "was material," which requires "balancing ... both the indicated probability that the event will occur and the anticipated magnitude of the event in

light of the totality of the company activity." 🚩 *Stratte-McClure*, 776 F.3d at 102–03 (internal quotation marks omitted) ("Item 303's disclosure requirement can only sustain a claim under Section 10(b) and Rule 10b-5 if the allegedly omitted information satisfies the [balancing] test" just stated).

### a. Alleged Misleading Affirmative Statements

Here, Plaintiff does not identify any statements that are actionable as half-truths due to Defendants' failure to disclose its business reliance on storing No. 6 fuel oil. None of Defendants' alleged statements were literally true but misleading absent a disclosure about how much No. 6 fuel oil IMTT's facilities could store, nor does Plaintiff identify any statements that share a reasonable level of specificity with a breakdown of how much No. 6 fuel oil IMTT stored or what other uses could be made of the IMTT's storage tanks. For example, Plaintiff argues that Defendants made misleading statements when they stated on earnings calls that MIC's business performance had been "boringly predictable" and that MIC had an "unsexy business model." (MTD Opp. 19 (citing CAC ¶¶ 8, 38, 110, 112, 129, 144–45, 150, 230, 232–33, 247–48, 269, 354).) These non-specific, generic statements, as with many others Plaintiff identifies, are the "type of milquetoast corporate-speak" that do not create a duty to disclose more facts. *See* *Menaldi*, 277 F. Supp. 3d at 513. [13] Moreover, many of Defendants' alleged statements, when actually read "in context" in which they were made, *cf.* 🚩 *Jinkosolar*, 761 F.3d at 250, are not forward-looking accounts of IMTT's business, but backward-looking explanations of "historical fact[s,]" which are not actionable absent some reason to believe that they were false when made or that Defendants later learned to be untrue but failed to correct, *see* *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 562, 569 (S.D.N.Y. 2011). For example, Plaintiff points to SEC filings in which MIC reported that it had seen "continued strong demand for the products stored" at IMTT during a reporting period, (CAC ¶¶ 111, 271), which is not only a backwards-looking account of what happened in a particular reporting period, but a statement made in the context of explaining how "sizeable and largely unforeseen volatility in petroleum product prices recently has impacted IMTT," (Schreiber Decl. Ex. F, at 8). As such, far from being an assurance to investors that "none of IMTT's stored commodities were susceptible to any known market trends" as Plaintiff argues, (MTD Opp. 28), this statement and others

like it confirm precisely what it says: that "volatility in petroleum product prices" has "impact[s]" on IMTT.

13      As yet another example, Plaintiff alleges that Defendants "misled investors about IMTT's considerable storage of No. 6 fuel oil" because a MIC officer stated in May of 2016 that IMTT had "the 'flexibility' and 'optionality' to change when 'one day our customer ... [sic] want gasoline in his tanks, next day he may want distillate.' " (CAC ¶ 116). Plaintiff alleges that this was misleading because any tank used to store No. 6 fuel oil "could take up to nine months" to be repurposed for other uses. (*Id.*) Putting to the side that the source transcript quoted is obviously riddled with errors, a review of the transcript shows that the officer was not making a claim about the amount of "flexibility" or "optionality" IMTT had in its tanks. (Schreiber Decl. Ex. H, at 21.) Telling people that it is beneficial to have flexibility is quite different from saying that a business has even a qualitative amount of flexibly to store different categories of products. As such, Plaintiff has offered me no reason to think that these statements would have done anything to give investors an impression about the extent of IMTT's business in No. 6 fuel oil. I also note that throughout the relevant period IMTT did have the capacity to store products other than No. 6 fuel oil.

**\*8** Moreover, Plaintiff never pleads facts to support its argument that Defendants knew any alleged statement was untrue or a half-truth when made. [14] To the contrary, Plaintiff pleads that Christopher Frost, who replaced Hooke as MIC's CEO after the end of 2017 (*see* CAC ¶¶ 30, 259), stated that it was not until "December [of 2017] and early January" of 2018 that "a number of [IMTT] customers terminated contracts," and that this loss of business was "quite sudden" and "a surprise." (CAC ¶ 185.) Plaintiff attempts to contradict this account of "surprise" with statements from three of MIC's former employees, (*id.* ¶¶ 187, 189), but none of these statements suggest Frost spoke untruthfully. Indeed, the most directly allegedly "contradictory" account concerns whether "the decline in No. 6 fuel oil markets snuck up on [Defendants] in one quarter," (*id.* ¶ 187), but Frost only spoke about surprise as to the much more specific circumstance of sudden contract cancellations and the fact that certain customers were leaving the business entirely, (*id.* ¶ 185). [15] Moreover, the Consolidated Complaint does not plead that the

former employees whose statements it recounts were in any position to know if Frost or MIC as a whole were "surprised" by sudden contract cancellations or by customers leaving the business. Two of these employees had left MIC before the Class Period began—one in 2011, (*id.* ¶ 59), and the other in December 2014, (*id.* ¶ 74)—and the third simply told Plaintiff that "IMTT was already working on the renewals of No. 6 fuel oil contracts" "by February 2017," (*id.* ¶ 189). As such, none of these statements provide facts from which I can infer that Frost lied about being surprised by sudden contract cancellations and customers leaving the business in December of 2017 and January of 2018. *Cf. Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018) ("[T]he FEs identified which reports were circulated during the Class Period; they stated that these reports reached senior executives; they described the Symphony platform reports to which Defendants had access during the Class Period; and they described the Individual Defendants' attendance at meetings and on conference calls during which integration-related issues were discussed.").

14      One statement Plaintiff argues Defendants must have known was false when made concerns IMTT's "utilization"—meaning the amount of IMTT's storage capacity in use at a particular time. Specifically, Plaintiff says, in December 2017, when Defendants said that IMTT's utilization "was "[c]onsistently high," (CAC ¶ 169), Defendants knew this had become untrue. Plaintiff argues that IMTT's utilization must have fallen to below its higher historic rate by late October 2017 because, while "IMTT utilization at the end of the third quarter 2017 was 93.2%," the "utilization at the end of the fourth quarter was 89.6%. To reconcile that decline with the reported average utilization rate for the fourth quarter of 90.6% means that there must have been at least 66 days of 89.6% utilization rate, or that IMTT lost the utilization as early as October 25, 2017. [CAC] ¶170." (MTD Opp. 42.) Defendants counter that Plaintiff's "flawed math equation ... assumes a steady, linear rate of utilization decline." (Doc. 113 at 8 n.3). I agree; Defendants are correct to call Plaintiff's math "flawed." The equation Plaintiff provides in the CAC appears to be an erroneous extrapolation of the formula for calculating an arithmetic mean. If there are 92 days in the Q4 2017 period, and if the mean

utilization for the period is 90.6%, then 90.6% =

$$\frac{x_1 + x_2 + x_3 + \cdots + x_{91} + x_{92}}{92}$$

, where each $x_1$, $x_2$, etc., is the utilization rate on each of the days during the period. But Plaintiff writes "$90.6\% = 89.6\% * \left(\frac{x}{92}\right) + 93.2\% * \left(\frac{(92-x)}{92}\right)$" (CAC ¶ 170). Plaintiff's equation thus proceeds from the assumption that IMTT's utilization rate on each day of Q4 2017 was either 89.6% or 93.2%. Plaintiff does not point to any allegations to support this assumption.

[15] Further cutting against Plaintiff's misstatement theory, market analysis articles quoted in the CAC indicate that the precise moment of any IMO 2020-related downturn in No. 6 fuel oil was always going to catch the industry by surprise. For example, one article states that, under IMO 2020, the "production and supply of [high-sulfur fuels like No. 6 fuel oil would need to continue until the day before the 0.5% requirement kicks in, and immediately demand for [these heavy fuels] will shrink dramatically the day after, creating a [sic] never before known situation of severe supply/ demand mismatch." (Schreiber Decl. Ex. O, at 4 (cited in CAC ¶ 97).)

Thus, despite Plaintiff's various arguments to the effect that Defendants must have already known that IMTT was experiencing a downturn or at a major risk for a downturn, (*e.g.*, MTD Opp. 40), Plaintiff falls short of pleading facts showing that Defendants' statements were "not honestly believed when they were made," *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 472 (S.D.N.Y. 2017), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) (internal quotation marks omitted).

**\*9** Plaintiff's position with regard to many of Defendants' affirmative statements seems to boil down to the view that securities fraud defendants must "be forthright about the present facts, risks, and threats facing [their company] when affirmatively disclosing its business and environment." (MTD Opp. 29.) This statement misses the mark, because simply speaking on one's business does not trigger a duty to disclose all facts an investor may want to know no matter how tangential they are to what the speaker is talking about. Rather, the cases cited by Plaintiff show that

the duty to be forthright is triggered when a defendant speaks with sufficient "specificity" while omitting information that one would normally expect the defendant to have included had the defendant known it. *See Diehl*, 339 F. Supp. 3d at 163. In *Jinkosolar*, for example, the Second Circuit held that it was misleading for a company to make detailed, comforting statements about how it handled environmental compliance, 761 F.3d at 247, while at the same time withholding that, at the very moment it spoke, the company had known, ongoing issues "prevent[ing] substantial violations of" particular environmental regulations, *id.* at 251. Similarly, a company makes a misleading statement if it says it "anticipate[s] 'relatively flat' revenues" from a particular customer while its management already knows that the company has lost substantial business from that customer. *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 737 (S.D.N.Y. 2015); *see also Darquea v. Jarden Corp.*, No. 06 CV 0722(CLB), 2007 WL 1610146, at *8 (S.D.N.Y. May 31, 2007) (holding statements were misleading when defendants spoke in "present tense" about a business's positive performance when they already knew that "sales fell $20 million short of its projections").

In contrast to these cases, Plaintiff does not allege that Defendants made comforting statements while they already knew that MIC's business storing No. 6 fuel oil was waning. For example, Plaintiff identifies an email that Defendant Davis exchanged with representatives of the Plaintiff, in which Plaintiff's employees directly asked about "new regulations coming in 2020"—i.e., IMO 2020—"that prevent fuel ships from using heavy oils unless improved scrubbers are also installed to clean exhaust – how will this impact demand for heavy oil?" (Schreiber Decl. Ex. BB, at 2 (cited in CAC ¶ 166).) In response, Davis writes that Plaintiff's "information" about what IMO 2020 will do "is consistent with our understanding of the proposed regulatory changes." (*Id.*) He goes on to say that, because black oil is always produced as part of the petroleum refinement process, the producing industry will try to find other uses for it. (*Id.*) Davis then speculates on a potential "positive" impact on "storage demand at IMTT-Bayonne" if producers decide to start selling "the [No. 6 fuel oil]" to "other parts of the world" where its burning will not be banned. (*Id.*) Nothing in this email amounts to a specific "comforting statement[ ]" about IMTT's ability to withstand IMO 2020, much less a comforting statement made while Davis knew or should have known that IMTT's business had already been

negatively impacted by IMO 2020. [16] *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("without *contemporaneous* falsity, there can be no fraud"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Far from comforting Plaintiff, Davis confirmed that Plaintiff, "a sophisticated institutional investor," (CAC ¶ 27), correctly understood that IMO 2020 could prevent the shipping industry from burning No. 6 fuel oil.

[16]     Plaintiff also argues that Davis' email was an actionable misstatement because Plaintiff's representatives asked "What percent of IMTT's storage is in heavy oil?" Davis responded "About 20%." (Schreiber Decl. Ex. BB, at 2). Plaintiff argument assumes that the answer concerns MIC's total storage capacity for No. 6 fuel oil; however, Plaintiff's citation does not provide the context within which this question was asked and answered: that of MIC's storage business in a region around New York. Specifically, the individual questions were preceded by a preamble stating that the "questions" are meant to get at previously "highlighted weakness in the NY harbor" and how "IMTT['s] results" in the New York harbor have "h[eld] up pretty well" in spite of these weaknesses. (*Id.*) Moreover, both the first and third enumerated questions are explicitly stated as concerning the New York harbor. (*Id.*)

Finally, Plaintiff argues that Defendant Davis affirmatively misrepresented IMTT's reliance on No. 6 fuel oil during the Class Period based on remarks he made a conference in November 16, 2017, but, once again, these arguments fail to account for the context within which the statements were made. Specifically, Davis told conference attendees that IMTT's business is in storing "primarily refined petroleum products" and that IMTT does "very little [business storing] crude" petroleum products. (Schreiber Decl. Ex. CC, at 4 (cited in CAC ¶ 258).) Davis then said that "[a] little over half the capacity is in service and petroleum products, and as I say, very little of that is in crude or asphalt, any heavy product." (*Id.*) Plaintiff argues this was an assurance that IMTT did "very little" business in "heavy products" including "No. 6 fuel oil." (MTD Opp. 30.) But Plaintiff's argument ignores the distinction Davis had already drawn between "refined petroleum products" and "crude" products, a distinction that he reiterated when he said "as I say, very little of that is in crude." I do not read the subsequent qualifying statement of "any heavy product" as undoing the

distinction Davis drew not just once but twice. Moreover, Plaintiff in fact pleads that "No. 6 fuel oil" is a "refined petroleum product." (CAC ¶ 109.) As such, I cannot conclude that Davis was including No. 6 fuel oil as part of the "crude" side of the ledger in his remarks, and Plaintiff does not point to well-pleaded facts that suggest otherwise.

b. Alleged Omission

**\*10** Plaintiff's argument that Defendants violated disclosure obligations under Item 303 also fails. Although Plaintiff submits that Item 303 required Defendants to speak to "th[e] 'increasing uncertainty' " MIC faced, (MTD Opp. 28), Plaintiff does not actually plead an uncertainty that should have been disclosed, nor does Plaintiff plead in what SEC filing or filings Defendants were supposed to disclose it. Instead, Plaintiff pleads that Item 303 required MIC to "disclose that its profits, revenues, and dividends were at risk due to the implementation of IMO 2020," (CAC ¶ 278); however, Plaintiff pleads at length that IMO 2020 "was widely understood" as threatening the businesses of everyone "in the supply chain for No. 6 fuel oil," (*e.g.*, *id.* ¶¶ 9, 98). Indeed, Plaintiff specifically asked Davis about IMO 2020 and its potential impact on "fuel ships." (Schreiber Decl. Ex. BB, at 2 (cited in CAC ¶ 166).) Plaintiff also does not "allege that" any "omitted information was material" under the relevant "probability/magnitude test" for assessing Item 303 violations. *Stratte-McClure*, 776 F.3d at 103. Thus, even if Plaintiff had identified some known trend or uncertainty that implicated disclosure of IMTT's reliance on No. 6 fuel oil, Plaintiff would still have to allege that the "probability" of the event or uncertainty coupled with "the anticipated magnitude" of it were enough to make it material "in light of the totality of [MIC's] company activity." *Id.* at 102–03 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). Pleading materiality does not require much, *see SAIC*, 818 F.3d at 96, but it does require a plaintiff to say why there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available," *ECA, Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted).

More to the point, Plaintiff does not allege when Defendants "actually kn[ew]" of some uncertainty that rose to the level

of requiring an Item 303 disclosure. *Cf. SAIC*, 818 F.3d at 95. Unlike in the Second Circuit's leading cases about when Item 303 violations can support Section 10(b) claims, Plaintiff does not allege that MIC "had already" taken on losses related to its No. 6 fuel oil business before the Class Period began, *cf. Stratte-McClure*, 776 F.3d at 104–05, or that Defendants "actually knew" of an extant liability that it could be obligated to repay, *SAIC*, 718 F.3d at 95. Although, as stated, this is not meant to be a burdensome pleading requirement, at minimum, Plaintiff must plead facts supporting an inference that Defendants had actual knowledge of a material trend or uncertainty facing MIC's No. 6 fuel oil storage business, and that it had this knowledge early enough to require disclosure in some pre-February 2018 securities filing.

### B. *Scienter*

### 1. Applicable Law

Pursuant to the PSLRA, a well-pleaded securities fraud claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.' " *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313). In the Second Circuit, a strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," a plaintiff must allege that the defendant or its officers "benefitted in some concrete and personal way from the purported fraud." *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.*

As an alternative to the motive and opportunity to defraud, a plaintiff can raise a strong inference of scienter under the "strong circumstantial evidence" prong, requiring a

plaintiff to show conscious misbehavior or recklessness. *Id.* at 199 (citation omitted). Conscious misbehavior "encompasses deliberate illegal behavior," *Novak*, 216 F.3d at 308, whereas recklessness includes "conscious recklessness" or "a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 312). If motive to commit fraud has not been shown, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Beck v. Mfrs. Hanover Tr. Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

**\*11** Additionally, a strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. There are at least four circumstances that "may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.' " *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311).

### 2. Application

Plaintiff argues that they have pleaded scienter both through Defendants' motive and opportunity, (MTD Opp. 44), and through Defendants' recklessness or conscious misbehavior, (*id.* at 47).

As an initial matter, it does not appear that the motive and opportunity theory is viable under the circumstances presented here. Plaintiff's theory of the case is that Defendants "actively concealed from investors" the extent of "IMTT's" business in "No. 6 fuel oil." (MTD Opp. 28.) This is an assertion of "conscious misbehavior or," at minimum, "recklessness," and thus seems like a theory that cannot be supported by a motive and opportunity theory. *See Stratte-McClure*, 776 F.3d at 106 (citing *ECA*, 553 F.3d at 202). Nevertheless, I will address both Plaintiff's arguments related

to recklessness or conscious misbehavior and on motive and opportunity.

First, with regard to recklessness or conscious misbehavior, Plaintiff rehashes its already-rejected arguments that Defendants made "numerous statements" that it later "admitted" were false and that Defendants had actual knowledge "contradicting their public statements." (MTD Opp. 47–48) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001).) With regard to establishing scienter, "Second Circuit cases uniformly rely on allegations that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements." *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2007) (citation omitted). Although Plaintiff "do[es] not have to fix the exact date and time" that Defendants were aware that their statements were false, "they must supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged." *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000) (internal quotation marks omitted). As I have already determined, however, "nowhere in the [CAC] do[es] Plaintiff[ ] identify with specificity" the knowledge Defendants had or when they acquired this knowledge that their statements were false. *Cf. Pretium*, 256 F. Supp. 3d at 481 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)). Without actual, contemporaneous knowledge, Plaintiff's scienter arguments appear to be a "seiz[ing] upon disclosures made ... later" coupled with unsupported assertions that Defendants "should have" made disclosures sooner. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

Second, with regard to pleading scienter through motive and opportunity, Plaintiff also fails. As an initial matter, I find that one of Plaintiff's arguments simply cannot provide a motive. The fact that certain Defendants' compensation increased with MIC's "market capitalization," (MTD Opp. 45), does not move the ball for Plaintiff, as "[m]otives that are common to most corporate officers, such as the desire ... to keep stock prices high to increase officer compensation" do not suffice to show scienter. *ECA, 553 F.3d at 198*; *Pretium*, 265 F. Supp. 3d at 481. Plaintiff's argument that Defendants wanted to prop up MIC's stock price so that it could purchase Epic in a majority-stock transaction and

thereby increase MIC's capacity for storing fuels not affected by IMO 2020, (MTD Opp. 45–46), is not precluded by the case law as a motive, since "the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud," *Rothman*, 220 F.3d at 93. There is thus some merit to Plaintiff's argument that the Epic acquisition benefited Defendants since it provided MIC with more capacity to store fuels unaffected by IMO 2020. (MTD Opp. 46.) "But the incentive to boost stock price to stimulate an impending acquisition or optimize the terms for the corporation, without more, does not constitute an adequate motive to defraud investors." *In re Yukos Oil Co. Sec. Litig.*, No. 04 CIV. 5243(WHP), 2006 WL 3026024, at *18 (S.D.N.Y. Oct. 25, 2006) (citing *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001) ("[a]chieving a superior [merger] agreement ... does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders")). In the circumstances of this case, I recognize that there could not have been much of a "concrete" "benefit[.]" *Cf. ECA, 553 F.3d at 198* (internal quotation marks omitted). MIC's market capitalization was around $5.75 billion through the end of the Class Period, *seesupra* 3–4 & n.6, whereas MIC acquired Epic for only around $171.5 million, (CAC ¶ 153). Even after the Class Period and the substantial loss to MIC's stock's value, MIC was still so much larger than Epic that it is hard to believe that this acquisition motivated any alleged securities fraud. In other words, the acquisition did not impact MIC's value as a company in a material way. Moreover, although Plaintiff asserts that MIC acquired Epic "to buffer" it "against IMO 2020," (*id.*), Plaintiff neither pleads facts to support the inference that MIC thought about IMO 2020 at all when it acquired Epic—much less that Epic could bolster MIC against any anticipated downturn that may result from IMO 2020—nor does Plaintiff demonstrate that the Epic acquisition "benefited [MIC] in some concrete ... way," as the law requires, *see ECA, 553 F.3d at 198* (internal quotation marks omitted), since no facts suggest that Epic buffered MIC at all against whatever forces caused the eventual in its stock price.

 **\*12** Plaintiff also argues that the Offering demonstrates motive and opportunity. Specifically, in the Offering, MIMUSA sold roughly 40% of its holdings in MIC for about $235 million dollars, and it did so shortly after IMO 2020 was re-affirmed as going into effect on schedule. (MTD Opp. 44; CAC ¶¶ 130–31.) The Offering is thus helpful to Plaintiff's scienter argument, since, if the Class Period

high stock price was propped up by misrepresentations or omissions, then MIMUSA could be said to have timed the Offering to maximize its profit. *See* *ECA, 553 F.3d at 198* (motive and opportunity "is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit.").

However, Defendants' other relevant behavior around MIC's stock cuts against a finding of scienter here. First, no individual Defendant is alleged to have sold any MIC stock during the Class Period. *See* *Rombach, 355 F.3d at 177* (no motive established where plaintiffs failed to allege "that defendants sold stock or profited in any way during the relevant period"). Second, pursuant to its management service agreement with MIC, MIMUSA continually elected to accept its base management fee in stock rather than in cash, including in both the third and fourth quarters of 2016. (Schreiber Decl. Ex. N, at 9–10); Macquarie Infrastructure Corp., Annual Report (Form 10-K), at 60 (Feb. 21, 2017); *seeAvon Pension Fund v. GlaxoSmithKline PLC, 343 F. App'x 671, 673 (2d Cir. 2009)* (no scienter where "[t]hree of the four individual defendants increased their net holdings of GSK stock during the class period, and the fourth individual defendant did not sell any shares at all."). Third, Defendants point out that there was a fifteen-month gap between the Secondary Public Offering and the drop in MIC's stock price at the end of the class period. *See* *In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008)* ("The lapsing ... of approximately four months between these substantial sales and the revelation of the alleged falsity, inescapably attenuates any inference of scienter that may be drawn in Lead Plaintiffs' favor."). Fourth, MIMUSA made a pre-Class Period sale of 27.6% of its holdings of MIC stock in June 2015, (CAC ¶ 309), which suggests that the Secondary Public Offering was not all that unusual.

Even considering "all of the facts alleged, taken collectively," *Tellabs, 551 U.S. at 323*, I cannot find that Plaintiff has adequately pleaded facts giving rise to a strong inference of scienter. At best, it appears that Defendants were negligent concerning the risks IMTT faced in its exposure to a potential downturn in the demand to store No. 6 fuel oil. However, that is not legally sufficient to demonstrate scienter.

### C. *Plaintiff's Remaining Claims*

Plaintiff's remaining claims all fail because they depend on Plaintiff's having successfully pleaded, at minimum, material misrepresentations or omissions, which Plaintiff failed to do, *see supra.* Specifically, each of the other statutes Plaintiff claims have been violated require a primary violation and/or material misrepresentations or omissions. *See* *Slayton, 604 F.3d at 778* (pleading a section 20(a) claim requires "a primary violation" of the '34 Act) (internal quotation marks omitted); *In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 389 (E.D.N.Y. 2003)* ("In the absence of a primary violation of Section 10(b) or Rule 10b-5, plaintiffs cannot state a claim ... for insider trading under Section 20A."); *In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 296 (S.D.N.Y. 2003)* (Section 11 liability requires "material misrepresentations"); *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 423 (S.D.N.Y. 2011)* ("Section 12(a)(2) ... imposes liability" when "a prospectus ... 'includes an untrue statement of material fact or omits to state a material fact' ") (quoting *15 U.S.C. § 77l(a)(2)*); *In re Lehman Bros. Mortg.-Backed Sec. Litig., 650 F.3d 167, 185 (2d Cir. 2011)* ("Section 15 imposes ... liability" on those who "control[ ] any person liable under § 11.") (internal quotation marks omitted).

### V. <u>Conclusion</u>

**\*13** For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Clerk's office is directed to terminate the open motions on the docket and to post notice of this Opinion & Order on the docket for the related action numbered 18-cv-3744.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 4084572

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.