UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re FASTLY, INC. SECURITIES LITIGATION. | Case No.  20-cv-06024-PJH |
| | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| | Re: Dkt. No. 70 |

Defendants' motion to dismiss lead plaintiff's consolidated complaint came on for hearing before this court on November 4, 2021.  Plaintiff appeared through his counsel, Laurie L. Largent.  Defendants appeared through their counsel, Jessica Valenzuela Santamaria and Brett H. De Jarnette.  Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendants' motion, for the following reasons.

## I.    BACKGROUND

This is a putative class action involving allegations of securities fraud.  Defendant Fastly, Inc. ("Fastly") is an "edge" cloud platform that enables companies to deliver digital content to users from Fastly's servers rather than their own.  Compl. ¶ 2.  Traditionally, websites and digital applications rely on one centralized server to process data for users all over the world, resulting in lag times and poor user experiences.  Dkt. 70-6 at 4.  Fastly solves this problem by locating data centers close to end users (the "edge"), which increases internet speed, security, and reliability of digital content for a better user experience.  Compl. ¶ 2; Dkt. 70-6 at 5.  Defendant Joshua Bixby is Fastly's CEO.

United States District Court
Northern District of California

1  Defendant Adriel Lares was Fastly's CFO during the putative class period.  Plaintiff

2  Andrew Zenoff was appointed lead plaintiff by the court on February 10, 2021, replacing

3  the originally named plaintiff, Marcos Betancourt.  Dkt. 61.  He earlier presented evidence

4  that he lost $105,848 due to defendants' alleged misconduct.  Dkt. 42 at 6.

5  ### A.    About Fastly's Business

6  Fastly earns revenue based on how much internet traffic its nearly 2,000

7  customers route through its content delivery network ("CDN").  Compl. ¶¶ 10, 66, 115.

8  During the Class Period, Fastly had nearly 300 enterprise customers—those generating

9  over $100,000 a year in revenue.  Compl. ¶ 69.  Most customers have no commitment to

10 use Fastly's platform and can reduce or terminate usage at any time and for any reason.

11 Compl. ¶ 66.  As a result, customer usage can fluctuate in any given quarter for any

12 number of reasons.  Compl. ¶ 66.  Fastly does not know how much traffic a customer will

13 route through its platform until the traffic has traveled through its CDN.  See Ex. 5 at 20,

14 64 (Dkt. 70-6 at 12, 36); Ex. 8 at 47-50 (Dkt. 70-9 at 16-19); Ex. 16 at 35 (Dkt. 70-17 at

15 11).  Further, Fastly's customers are not obligated to route all traffic through Fastly's

16 platform; rather, customers often utilize two or more competing CDNs.  Id.

17 ### B.    Fastly Announces Strong First Quarter 2020 Results

18 Fastly reported strong performance in the first quarter of 2020 as an

19 unprecedented global pandemic forced people to stay at home, increasing general

20 internet traffic.  Compl. ¶¶ 53, 56.  On May 6, 2020, the first day of the Class Period,

21 Fastly's CEO, Joshua Bixby, published a shareholder letter reporting first quarter results.

22 Bixby reported that the company generated $63 million in revenue that quarter,

23 exceeding its projected range of $58-60 million, and representing a 38% increase over

24 the first quarter of 2019.  Compl. ¶ 53; Ex. 6 at 6 (Dkt. 70-7 at 7).  Bixby attributed

25 Fastly's revenue growth to adoption of its platform by new customers, and expansion and

26 increased spending by existing customers across all geographies, which were "bolstered

27 by increased internet traffic from social distancing measures."  Compl. ¶¶ 53, 56.  Bixby

28 expected increased traffic attributed to the COVID-19 pandemic to "continue into Q2 and

United States District Court
Northern District of California

future periods."  Compl. ¶ 56.  Based on its optimism, Fastly increased its full-year revenue guidance for 2020 from $255-265 million to $280-290 million.  Compl. ¶¶ 53, 55; Ex. 6 at 16 (Dkt. 70-7 at 17).  It also estimated $70-72 million in revenues for the second quarter.  Ex. 6 at 17 (Dkt. 70-7 at 18).

That same day, Fastly held a conference call with investment analysts to further discuss its first quarter results.  One analyst asked whether Fastly's second quarter revenue guidance incorporated "assumptions for bad debt or contract repricings."  Compl. ¶ 59.  Adriel Lares, Fastly's then-CFO, responded that Fastly's enterprise customers "seem to be in good shape" and "we're not seeing anything at least concerning from a sort of the Q2 perspective."  Compl. ¶ 59.

### C.   Fastly Warns Investors About Risks to Its Business and Customer Usage

Despite its optimism, Fastly repeatedly warned investors of the risks associated with its usage-based model.  Before the start of the Class Period, Fastly filed its Form 10-K with the Securities and Exchange Commission ("SEC"), warning investors that customers could reduce usage at any time and for any reason.  Specifically, Fastly warned:

> Because our customers' minimum usage commitments for our platform are relatively low compared to their expected usage, it can be easy for certain customers to reallocate usage or switch from our platform to an alternative platform altogether. In addition, even if our customers expand their usage of our platform, we cannot guarantee that they will maintain those usage levels for any meaningful period of time.

Fastly similarly cautioned:

> Our usage and revenue may decline or fluctuate as a result of a number of factors, including customer budget constraints, customer satisfaction, changes in our customers' underlying businesses, changes in the type and size of our customers, pricing changes, competitive conditions, the acquisition of our customers by other companies, and general economic conditions.

Ex. 5 at 20 (Dkt. 70-6 at 12).  Fastly also disclosed that regulatory scrutiny of international customers, specifically those in China, could impact its revenue.  Ex. 5 at 27 (Dkt. 70-6 at

3

1   18).  These customers represented almost 30% of its revenues:

> If the U.S. government prohibits our current or potential customers from doing business with us, whether through policy, regulations or laws, we could face direct liability or our delivery of content by our platform may be blocked. For example, the U.S. government has expressed concerns about the ability of companies operating in China to do business in the U.S. or with U.S. companies, and 29% of our total revenue was generated from customers outside of the United States for the year ended December 31, 2019. As a result, we could lose the ability to contract with current or potential customers, which could harm our business and reputation.

8   Id.  Fastly reiterated these warnings in its Forms 10-Q filed with the SEC during the Class

9   Period.  See e.g., Ex. 8 at 47, 55 (Dkt. 70-9 at 16, 24).

10        **D.    The Trump Administration's Chatter About Regulating Chinese Trade**

11        Consistent with Fastly's risk disclosures that the U.S. government had expressed

12  concerns about business with China, President Trump hinted at regulating trade with

13  China since taking office.  Ex. 1 at 2 (Dkt. 70-2 at 3).  For example, in 2019, amidst what

14  media dubbed a "spiraling trade war," Trump unsuccessfully "ordered" through a Twitter

15  post that U.S. companies cease trade with China.  Id.  He also considered prohibiting all

16  Chinese companies from listing on U.S. stock exchanges.  Ex. 2 at 1 (Dkt. 70-3 at 2).

17  This chatter intensified through early 2020 in the face of political tension surrounding the

18  U.S. presidential election and Trump's blaming of China for the COVID-19 pandemic.

19  One of many companies caught in the crossfire was TikTok, a video streaming

20  application owned by Chinese technology company ByteDance.  Ex. 3 at 1 (Dkt. 70-4 at

21  2).  From January 2018 through June 2020, as it became the social media application du

22  jour for young people, TikTok's monthly U.S. users grew to nearly 80 million.  Ex. 11 at 2

23  (Dkt. 70-12 at 3).

24        In November 2019, the Committee on Foreign Investment ("CFIUS") began

25  investigating TikTok for potential national security risks.  Ex. 3 at 1 (Dkt. 70-4 at 2).

26  CFIUS investigations are routine and rarely result in government action.  See Ex. 9 at 4

27  Dkt. 70-10 at 14).  For example, from 2010 to 2019, out of 810 CFIUS investigations, only

28  five (0.6%) resulted in presidential action.  Id.  Even an article cited in the complaint

4

1    opined that, despite the CFIUS investigation, TikTok would "most likely" be allowed to

2    continue operating in the U.S.  Ex. 4 at 2 (Dkt. 70-5 at 3).  TikTok repeatedly denied any

3    influence by foreign governments, stating: "TikTok is led by an American CEO, with

4    hundreds of employees and key leaders across safety, security, product, and public

5    policy here in the U.S.  We have no higher priority than promoting a safe and secure app

6    experience for our users . . . We have never provided user data to the Chinese

7    government, nor would we do so if asked."  Ex. 10 at 1 (Dkt. 70-11 at 2).  Nonetheless, to

8    ensure "cyber awareness," some branches of the U.S. military restricted the use of

9    TikTok on government-issued devices.  Compl. ¶¶ 23-25.  The Department of Defense

10   similarly "urged Pentagon employees to uninstall the app . . ." on government-issued

11   devices.  Id.

12        After Fastly reported first quarter results in May 2020, the U.S. government's

13   attention on TikTok dramatically intensified. In June 2020, TikTok users reportedly

14   sabotaged a President Trump campaign rally in Oklahoma, where 20,000 people

15   attended despite a purported one million RSVPs.  Ex. 11 at 3 (Dkt. 70-12 at 4).  That

16   ostensibly drew President's Trump ire, as a few weeks later, then-Secretary of State Mike

17   Pompeo told Fox News that the Trump administration was "looking at" a ban of TikTok in

18   the U.S.  Compl. ¶ 27.  And on August 3, 2020, President Trump, for the first time, said

19   he planned to ban TikTok unless a U.S. company acquired it.  Ex. 11 at 1-2 (Dkt. 70-12 at

20   2-3).

21        **E.    Fastly Discloses TikTok as a Customer When Reporting Q2 Results**

22        Given the mounting concern and increased scrutiny of TikTok since Fastly had

23   reported its first quarter earnings in May, when it announced second quarter results on

24   August 5, Fastly disclosed that TikTok had been its largest customer during Q2 (13% of

25   revenue) and for the first half of 2020 (12% of revenue).  Compl. ¶ 74.  Although Fastly

26   was not required to disclose its largest customer mid-year, Bixby explained that Fastly

27   "chose to do this voluntarily.  And we did it because we think it's information that we want

28   to be really transparent with our investors and make sure everyone knows exactly where

United States District Court
Northern District of California

we're at." Ex. 17 at 11 (Dkt. 70-18 at 13).  Bixby similarly warned that, "any ban of the TikTok app by the U.S. would create uncertainty around our ability to support this customer" and "would have an impact on our business."  Ex. 13 at 5 (Dkt. 70-14 at 7).  And while Fastly expressed a belief that it was "in a position to backfill the majority of this traffic in case [TikTok is] no longer able to operate in the U.S." (Ex. 13 at 5 (Dkt. 70-14 at 7)), Bixby was clear, when asked about the ability to backfill, that he "wouldn't want to . . . say that that's something we can totally guarantee."  Ex. 18 at 10 (Dkt. 70-19 at 12).

The company also reported that Q2 results were better than anticipated, with $75 million in revenues, exceeding its projection of $70-72 million.  Ex. 6 at 16; Ex. 12 at 6 (Dkt. 70-7 at 17; Dkt. 70-13 at 7).  Fastly also reported an increase in its customer base from 1,837 to 1,951, with enterprise customers increasing from 297 to 304.  Ex. 12 at 7 (Dkt. 70-13 at 8).  Bixby explained "[t]hese results were driven primarily by continued strong fundamentals of our core business, which were further enhanced by elevated traffic levels across the internet and our platform as people continued to stay home."  Id.

Fastly remained optimistic about its business: "[d]espite the economic uncertainty, we remain confident in the demand for our mission-critical services and the continued momentum of our business for the remainder of 2020 and the years to come." Ex. 12 at 7 (Dkt. 70-13 at 8).  Fastly cautioned investors that its projections and beliefs about future performance "may not materialize, and actual results in future periods are subject to risks and uncertainties that could cause actual results to differ materially from those projected." Ex. 12 at 18; Ex. 13 at 4 (Dkt. 70-13 at 19; Dkt. 70-14 at 6).  Lares also made clear that Fastly's guidance assumed TikTok's usage would be "status quo."  Compl. ¶ 77.

On August 6, 2020, the day after Fastly disclosed to investors that TikTok was a customer, President Trump issued an Executive Order (the "Order") purporting to ban any transaction between U.S. companies and ByteDance, to be effective 45 days later. Ex. 15 at 1-2 (Dkt. 70-16 at 2-3); Ex. 14 (questioning whether President Trump had "legal authority to ban the apps") (Dkt. 70-15).  Fastly filed its Form 10-Q for Q2 2020 the next day and included specific risk factors addressing the potential impact of this Order:

1
2
3
4
5
6
7
8
9
10

> The loss of one or more key customers or a reduction in usage by any major customers would reduce our revenues. For example, we cannot be certain what actions the U.S. or another country's government may take with respect to certain of our customers that operate in China, target China as a market, or have strong business ties to China. ByteDance, the operator of the TikTok application, operates in and has strong business ties to China and is our top customer, accounting for 13% and 12% of revenue for the three and six months ended June 30, 2020, respectively. On August 6, 2020, President Trump issued an executive order banning transactions with ByteDance, effective 45 days after the execution of the order. The TikTok application has also been the subject of bans in other countries. While we are still assessing the impact of these bans, the ban of the TikTok application by the U.S. government, and any other governments, creates uncertainty around our ability to support ByteDance. The loss of this customer's traffic could have a negative impact on our business.

11   Compl. ¶ 83.  Following these disclosures, Fastly's stock dropped from $108.92 to $89.64

12   per share.  Compl. ¶ 136.

13        **F.        Fastly Misses Third Quarter Revenue Guidance**

14        On October 14, 2020, the last day of the Class Period, and two weeks before

15   Fastly was scheduled to announce its third-quarter results, it issued a press release

16   projecting lower revenues for Q3 than it had previously anticipated: $70-71 million,

17   compared to $73.5-75.5 million.  Compl. ¶ 98.  Fastly also withdrew its prior revenue

18   guidance for 2020.  Ex. 19 at 1 (Dkt. 70-20 at 2).  It attributed its changed expectations to

19   two factors.  First, "[due] to the impacts of the uncertain geopolitical environment, usage

20   of Fastly's platform by [TikTok] did not meet expectations."  Compl. ¶ 98.  Second,

21   "[d]uring the latter part of the third quarter, a few customers had lower usage than Fastly

22   had estimated."  Compl. ¶ 98.  Following this announcement, Fastly's stock dropped from

23   $123.18 to $89.70 per share.  Compl. ¶ 140.  Fastly later reported third-quarter revenue

24   of $71 million on October 28, 2020. Compl. ¶ 107.

25        **G.        Fastly Reports Strong 2020 Revenue and TikTok's Ban Is Enjoined**

26        Fastly recovered from its Q3 revenue miss and reported $291 million revenues for

27   2020.  Ex. 24 at 17 (Dkt. 70-25 at 18).  This fell within the $290-300 million guidance

28   range given on August 5 that was withdrawn on October 14.

1    In late 2020, the U.S. District Court for the Eastern District of Pennsylvania

2 enjoined the U.S. from banning TikTok.  Marland v. Trump, 2020 WL 6381397 (E.D. Pa.

3 Oct. 30, 2020).  The U.S. District Court for the District of Columbia then barred the

4 removal of TikTok from U.S. app stores, finding that such removal may "likely exceed" the

5 bounds of the law.  TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 80 (D.D.C. 2020).

6    **H.    This Litigation**

7    This action was initiated by plaintiff Marcos Betancourt on August 27, 2020.

8 Dkt. 1.  Thereafter, another case was related to this one: Rami Habib v. Fastly, Inc., et al.

9 (4:20-cv-06454-JST).  Dkt. 27.  The cases were consolidated by the court pursuant to

10 stipulation.  Dkt. 53.  Following briefing for appointment of lead plaintiff in the

11 consolidated action, the court appointed Andrew Zenoff as lead plaintiff and Robbins

12 Geller Rudman & Down LLP as lead counsel.  Dkt. 61.

13    On April 12, 2021, lead plaintiff filed the complaint now at issue, seeking to

14 represent individuals who acquired Fastly stock between May 6 and October 14, 2020

15 (the "Class Period").  Dkt. 68.  The complaint alleges that Fastly, Bixby, and Lares

16 (together, "defendants"), violated Section 10(b) of the Securities Exchange Act of 1934

17 (15 U.S.C. §§ 78j(b)) and SEC Rule 10b-5 (17 CFR § 240.10b-5). Specifically, plaintiff

18 claims that various statements by defendants in May 2020 about Fastly's revenue

19 growth, enterprise customers, and demand for its platform were misleading because the

20 company did not disclose that TikTok was a customer (the "May Statements").  Compl.

21 ¶ 3.  Plaintiff also claims that after Fastly disclosed TikTok as a customer in August 2020,

22 defendants continued to mislead investors about the company's ability to backfill lost

23 TikTok traffic (the "August Statements").  Compl. ¶ 5.  The complaint asserts claims

24 under Section 20(a) against Bixby and Lares as alleged "control persons" of Fastly.

25    Defendants now ask the court to dismiss the consolidated complaint in its entirety

26 and with prejudice.  Defendants additionally request judicial notice of several documents.

27 //

28 //

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.   REQUEST FOR JUDICIAL NOTICE

In connection with their motion to dismiss, defendants request judicial notice of Fastly's filings with the Securities and Exchange Commission ("SEC"), transcripts of earnings calls and investor presentations, an analyst report, published articles, and information on a U.S. government website.

### A.   Unopposed Exhibits

Plaintiff does not object to the court taking judicial notice of Exhibits 1 and 2, which are public articles.  These two documents are referenced in defendants' recounting of the facts as context for the Trump Administrations' public statements regarding trade with China.

- Exhibit 1:  Zeke Miller, Powerful, Obscure Law Is Basis For Trump 'Order' On Trade, Associated Press, August 25, 2019, https://apnews.com/article/asia-pacific-donald-trump-ap-top-news-france-international-news-be18b8619cde4658a418dda4f416968a (last visited 11/23/2021).

- Exhibit 2: Ana Rappeport and Ana Swanson, White House Weighs Blocking Chinese Companies From U.S. Exchanges, The New York Times, September 27, 2019, https://www.nytimes.com/2019/09/27/us/politics/trump-china-stock-exchange.html (last visited 11/23/2021).

The court grants defendants' unopposed request for notice of these documents. They are considered for the context of their dates and the timing of the statements by the U.S. government, not necessarily for the truth of their contents.

### B.   Incorporation by Reference

"Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."  Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citations omitted).  The court may "treat such a document

9

as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006) (quoting United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003)).

Here, defendants request the court to consider Exhibits 3-8 and 10-23 incorporated in the complaint by reference. Plaintiff does not object to incorporation by reference of Exhibits 3-8 and 10-23 for the limited purpose of identifying the contents of those documents; however, plaintiff urges the court to reject defendants' efforts to have the court resolve issues of fact based these documents as it would be improper at this pleading stage. Defendant counters that the court may consider the documents incorporated by reference in order to resolve factual disputes and plaintiff fails to identify any well-pled allegations that are improperly disputed. Defendants offer, "the incorporation by reference doctrine is designed 'to prevent plaintiffs from highlighting only the portions of certain documents that support their claims, while omitting portions of those documents that weaken their claims.'" Jones v. Micron Tech. Inc., 400 F. Supp. 3d 897, 905 (N.D. Cal. 2019). Defendants have the better argument. The following exhibits are those that the court considers incorporated by reference.

- Exhibit 3: Tony Romm and Drew Harwell, Marco Rubio Seeks U.S. Government Probe Of TikTok Over Chinese Censorship Concerns, The Washington Post, October 9, 2019. This article is referenced in the complaint at ¶ 18.

- Exhibit 4: Geoffrey Gertz, Is TikTok A Threat To National Security?, The Washington Post, November 11, 2019. This article is referenced in the complaint at ¶ 21.

- Exhibit 5: copy of excerpts of Fastly's Annual Report for the year ended December 31, 2019, filed with the Securities and Exchange Commission ("SEC") on Form 10-K on March 4, 2020. This Form 10-K is referenced in the complaint at ¶¶ 12, 114, 136, and 151.

- Exhibit 6: press release and shareholder letter attached to and filed with the SEC on Form 8-K on May 6, 2020. This Form 8-K is referenced in the complaint at ¶¶

52-56.

- Exhibit 7: transcript of Fastly's earnings call for the first fiscal quarter of 2020 on May 6, 2020.  This transcript is referenced in the complaint at ¶¶ 57-61.

- Exhibit 8: copy of excerpts of Fastly's Quarterly Report for the quarter ended March 31, 2020, filed with the SEC on Form 10-Q on May 8, 2020.  This Form 10-Q is referenced in the complaint at ¶¶ 33-34, 63-69, 124.

- Exhibit 10: Timothy Bella, Pompeo Says U.S. 'Certainly Looking At' Banning TikTok And Other Chinese Apps, The Washington Post, July 7, 2020.  This article is referenced in the complaint at ¶ 27.

- Exhibit 11: Naeem Aslam, Trump Says He's Considering a Ban on TikTok in the U.S., Yahoo! Finance, July 8, 2020.  This article is referenced in the complaint at ¶ 29.

- Exhibit 12: press release and shareholder letter attached to and filed with the SEC on Form 8-K on August 5, 2020.  This Form 8-K is referenced in the complaint at ¶¶ 79, 116.

- Exhibit 13: transcript of Fastly's earnings call for the second fiscal quarter of 2020 on August 5, 2020.  This transcript is referenced in the complaint at ¶¶ 5, 35, 38, 73-79, 117, and 136.

- Exhibit 14: Tali Arbel, Trump Bans Dealings With Chinese Owners Of TikTok, Wechat, Associated Press, August 6, 2020.  This article is referenced in the complaint at ¶ 29.

- Exhibit 15: Exec. Order No. 13,942, 85 FR 48637 (2020).  This Executive Order, signed August 6, 2020, and titled "Addressing the Treat Posed by TikTok, and Taking Additional Steps to Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain" is referenced in the complaint at ¶ 29, 36, and 138.

- Exhibit 16: excerpts of Fastly's Quarterly Report for the period ended June 30, 2020, filed with the SEC on Form 10-Q, on August 7, 2020.  This Form 10-Q is

referenced in the complaint at ¶¶ 83-89, 114-15.

- Exhibit 17: transcript of Fastly's presentation at the Oppenheimer 23rd Annual Technology, Internet & Communications Conference on August 11, 2020.  This transcript is referenced in the complaint at ¶¶ 91-92.

- Exhibit 18: transcript of Fastly's presentation at the KeyBanc Capital Markets Future Of Technology Series on August 12, 2020.  This transcript is referenced in the complaint at ¶¶ 93-95.

- Exhibit 19: press release attached to and filed with the SEC on Form 8-K on October 14, 2020, titled Fastly Provides Preliminary Third Quarter Revenue Results.  This press release is referenced in complaint at ¶¶ 41, 97-98, 140.

- Exhibit 20: copy of excerpts from Fastly's Registration Statement, on Form S-3, filed with the SEC on October 15, 2020. This Form S-3 is referenced in the complaint at ¶ 106.

- Exhibit 21: report published by Piper Sandler on October 22, 2020, titled Downgrading To UW: Challenging Dynamics A Tough "Byte" To Swallow. This report is referenced in complaint at ¶¶ 104-05, 114, and 141.

- Exhibit 22: press release and shareholder letter attached to and filed with the SEC on Form 8-K on October 28, 2020.  This Form 8-K is referenced in the complaint at ¶¶ 107-08. 25.

- Exhibit 23:  Dan Rayburn, An Update On TikTok's DIY CDN Strategy And The Impact On Third-Party CDNs, Seeking Alpha, February 10, 2021.  This article is referenced in the complaint at ¶¶ 38, 113.

The court grants the request for incorporation by reference given that plaintiff does not object, the documents were referenced in the complaint, and plaintiff does not dispute their authenticity.

**C.    Opposed Exhibits**

Defendants additionally request that the court take judicial notice of Exhibits 9, 24, 25, and 26 because they will aid the court in ruling on the motion.  Defendants request

judicial notice of SEC reports that are not referenced in the FAC.  "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  District courts regularly take judicial notice of SEC filings in the context of securities litigation.  See Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

- Exhibit 9: copy of excerpts of a report issued by the Committee on Foreign Investment in the United States to Congress in July 2020, titled Committee on Foreign Investment in the United States Annual Report to Congress for Report Period: CY 2019.

Plaintiff objects to defendants' submission of the CFIUS report for the premise that CFIUS investigations are routine and rarely result in government action.  Plaintiff contends the conclusions drawn from the report are improper, where it is not as clear as defendants pose, it says nothing of the "routine" nature of CFIUS investigations defendants attempt to draw, and it does not give any information on the facts underlying the disposition of any particular case.  Defendants counter that the document from a government source is clearly reliable, and the data is accurate.  Defendants highlight plaintiff's lack of authority preventing notice of this report, and they describe, "Plaintiff fails to explain how conducting nearly 100 investigations a year is not 'routine' or how presidential action is not 'rare,' when it happens only 0.6% of the time."  Dkt. 79 at 6. This dispute goes to the merits, not whether this document is the proper subject of judicial notice.  The court grants defendants' request to take judicial notice of Exhibit 9, excerpts from the CFIUS report, because it is not subject to reasonable dispute.

- Exhibit 24: press release and shareholder letter attached to Fastly's Form 8-K filed with the SEC on February 17, 2021.

Plaintiff objects to defendants' use of Exhibit 24 for purposes of challenging the allegations of falsity regarding defendants' third quarter 2020 and fiscal year 2020

guidance statements.  Defendants find plaintiff's argument "absurd," advancing that "The Supreme Court requires the Court to consider judicially noticeable facts in determining whether the complaint adequately pleads a securities fraud claim."  Dkt. 79 at 7 (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).  The court agrees with defendants.  The SEC-filed document is not subject to reasonable dispute, and it is relevant to establish Fastly's reported revenues as well as consideration of whether defendants misled investors.  The court grants defendants' request to take judicial notice of Exhibit 24.

- Exhibit 25 is a compilation of copies of all Form 4 Statements of Changes in Beneficial Ownership for Joshua Bixby, filed with the SEC between May 6, 2020 and October 14, 2020.

- Exhibit 26 is a compilation of copies of all Form 4 Statements of Changes in Beneficial Ownership for Adriel Lares, filed with the SEC between May 6, 2020 and October 14, 2020.

Plaintiff objects to defendants' use of Exhibits 25 and 26 to show that Bixby and Lares' stock sales were planned and made pursuant to Rule 10b5-1 trading plans. Plaintiff argues that the issue of whether the sales were made pursuant to a Rule 10b5-1 plan is a factual determination and an affirmative defense, inappropriate at the pleading stage.  In re UTStarcom, Inc. Sec. Litig., 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[A]lthough evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); In re Apple Inc. Sec. Litig., 2020 WL 2857397, at *22 n.13 (N.D. Cal. June 2, 2020) ("the use of the 10b5-1 plan is an affirmative defense that does not rebut well-pled allegations of scienter").  Plaintiff also takes issue with defendants' offering of Form 4s instead of the 10b5-1 plans themselves.  Defendants note that plaintiff does not dispute that the Form 4s demonstrate that Bixby and Lares' sales were made pursuant to 10b5-1 plans.  And defendants additionally note that courts regularly look at Form 4s showing

14

1   stock purchases pursuant to 10b5-1 plans.  See, e.g., Wietschner v. Monterey Pasta Co.,

2   294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003) (granting judicial notice of Form 4s that

3   were "integral to the stock sale allegations made in the Complaint"); Park v. GoPro, Inc.,

4   2019 WL 1231175, at *7 (N.D. Cal. Mar. 15, 2019) (taking judicial notice of exhibits "for

5   the purposes of showing that [defendants] had nondiscretionary 10b5-1 stock sales

6   plans").

7        Though couched as an argument against judicial notice, plaintiff's argument is one

8   regarding the sufficiency of his scienter pleading, considered more in depth below.

9   Plaintiff's argument does not preclude judicial notice of the Form 4s.  The court grants

10  defendants' request to take judicial notice of Exhibits 25 and 26, noting that defendants'

11  sales pursuant to 10b5-1 plans are not determinative on the issue of whether Bixby and

12  Lares' sales were improper insider trades.

13  **III.    DISCUSSION**

14      **A.    Motion to Dismiss Legal Standards**

15          **1.    Standard Under Rule 12(b)(6)**

16      A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the

17  legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock, 349 F.3d 1191,

18  1199-1200 (9th Cir. 2003).  Under Federal Rule of Civil Procedure 8, which requires that

19  a complaint include a "short and plain statement of the claim showing that the pleader is

20  entitled to relief," a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to

21  state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable

22  legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

23      While the court accepts as true the factual allegations in the complaint, legally

24  conclusory statements not supported by actual factual allegations need not be accepted.

25  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  The complaint must proffer sufficient

26  facts to state a claim for relief that is plausible on its face.  Bell Atlantic Corp. v. Twombly,

27  550 U.S. 544, 555, 558-59 (2007).

28      "A claim has facial plausibility when the plaintiff pleads factual content that allows

United States District Court
Northern District of California

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

### 2.    Pleading Standard for Securities Fraud

Securities' fraud claims under § 10(b) of the Securities Exchange Act of 1934, and Securities Exchange Commission Rule 10b-5 promulgated thereunder must "meet the higher, [more] exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)."  Or. Pub. Emp. Ret. Fund v. Apollo Group Inc., 774 F.3d 598, 603-04 (9th Cir. 2014).  Under Rule 9(b), claims alleging fraud are subject to a heightened pleading requirement—that a party "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  And private securities fraud complaints are subject to the "more exacting pleading requirements" of the PSLRA, which require that both falsity and scienter be pled with particularity.  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).

To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege particularized facts showing (1) a material misrepresentation or omission of fact; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance or "transaction causation;" (5) economic loss; and (6) loss causation (causal connection between the material misrepresentation and the loss).  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); see also Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011).  In order to properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 877 (9th Cir. 2012) (internal quotation marks and alteration omitted).  In addition, in

1    order to "adequately plead scienter under the PSLRA, the complaint must state with

2    particularity facts giving rise to a strong inference that the defendant acted with the

3    required state of mind."  Id. (internal quotation marks omitted).

4        **B.    Analysis**

5        Plaintiff alleges two causes of action: (1) violations of Section 10(b) of the

6    Exchange Act and SEC Rule 10b-5 promulgated thereunder (against all defendants), and

7    (2) violations of Section 20(a) of the Exchange Act (against the individual defendants).

8        "To plead a claim under section 10(b) and Rule 10b-5, Plaintiffs must allege: (1) a

9    material misrepresentation or omission; (2) scienter; (3) a connection between the

10   misrepresentation or omission and the purchase or sale of a security; (4) reliance;

11   (5) economic loss; and (6) loss causation."  Apollo Group, 774 F.3d at 603.

12       Defendants do not argue that plaintiff failed to allege the following four elements:

13   (1) the connection between the misrepresentations or omissions and the purchase or

14   sale of a security, (2) reliance, (3) economic loss, or (4) loss causation.  This order

15   therefore does not address these elements.  Defendants contend that plaintiff failed to

16   allege (1) material misrepresentations or omissions and (2) scienter.  Both elements are

17   discussed in turn below.

18       The parties initially discuss the adequacy of plaintiff's pleading from a visual

19   perspective—whether plaintiff's reproduction of defendants' statements and use of bold

20   and italic font reflects the challenged portions of the statements to the reader.

21   Defendants' points are well taken.  Plaintiff's complaint relies heavily on bold and italic

22   font without sufficient explanation of the meaning of such emphasis.  It is difficult to

23   understand which portions of defendants' statements plaintiff challenges as a result,

24   especially where at least some of the emphasized text is not contested as false, such as

25   "[w]e generated $63 million in revenue."  Compl. ¶¶ 53, 54, 63.  This practice diminishes

26   the particularity of plaintiff's pleading, but this need not serve as the basis for dismissal of

27   the complaint.  The complaint is dismissed on the merits, as discussed more fully below.

28

United States District Court
Northern District of California

**1.      Material misrepresentations or omissions**

**a.      Whether defendants' statements were false when made**

Falsity is adequately alleged "when a plaintiff points to [the] defendant's statements that directly contradict what the defendant knew at that time." Khoja, 899 F.3d at 1008 (citing In re Atossa Genetics Inc. Sec. Litig., 868 F.3d 784, 794-96 (9th Cir. 2017)).  To plead falsity, a plaintiff must "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B); Zucco, 552 F.3d at 990-91.  A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks omitted).  Similarly, "an omission is material 'when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'" Markette v. XOMA Corp., No. 15-cv-03425-HSG, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017) (quoting Matrixx, 563 U.S. at 38).  But omissions are actionable only where they "make the actual statements misleading": it is not sufficient that an investor "consider the omitted information significant."  Id. at *7 (internal quotation marks omitted).

Both parties discuss separately the representations made by defendants in (1) May and June 2020 and (2) August 2020, so that division is replicated here.

**i.      May and June 2020 Statements**

Plaintiff specifies in his opposition brief the following representations he alleges were false when made:

> "On May 6, 2020 and June 2, 2020, Defendants touted (1) the strength of Fastly's enterprise customers, including their "good shape," "stability," ability to "continue to thrive," the "limited" credit risk exposure they posed, and the fact that they didn't present "anything major" or "concerning" (¶¶53-54, 57, 59-60, 69); (2) the "stronger demand" for Fastly's platform, including enterprise customers' "usage expansion" (¶¶54, 58, 61); and (3) its enterprise customers driving revenue growth and "continued strong business fundamentals" (¶¶53-54, 69, 71).

18

Dkt. 73 at 16.  The statements were false, plaintiff argues, because they conceal the difficulty TikTok faced at the time, with TikTok facing reportedly increased scrutiny from the U.S. government.  However, the omission of TikTok as a customer is not actionable where it did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).  Defendants did not represent at any point that TikTok was not a Fastly customer.  Defendants disclosed the very risk plaintiff alleges they concealed: that possible U.S. bans on Chinese companies "posed a material risk to Fastly's revenues."  Compl. ¶ 3.  Fastly noted even before the class period that nearly 30% of its revenue was at risk because of the U.S. government's expressed concerns regarding Chinese businesses.  See Fastly 2019 Form 10-K (Dkt. 70-6 at 18).  Nothing at the time suggested that TikTok would be singled out by the Trump Administration, not even the stale and routine CFIUS investigation referenced by plaintiff.  Therefore, plaintiff fails to plead the falsity of the May and June 2020 statements.

### ii.    August 2020 Statements

Plaintiff specifies in his opposition brief the following representations he alleges were false when made:

> On August 5, 6 and 11, 2020, over five weeks into 3Q20, Defendants reassured investors that (1) they are assuming "status quo" with regard to TikTok and are seeing "strong growth" for 3Q20 (¶¶76-79, 91, 93, 95); and that (2) they "are in a position to backfill the majority of [lost] traffic" in case of a TikTok ban "on a short notice" (¶¶74-75, 81, 92, 94). In truth, (1) TikTok had already started shifting traffic away from Fastly five weeks prior; (2) other Fastly enterprise customers had begun lowering their usage at the beginning of 3Q20; and (3) Fastly had already turned down many potential customers during the first half of 2020 because of the constraints TikTok's growing usage had put on Fastly's platform. ¶¶80, 82, 90, 96, 98, 101-105, 111-113, 141. Moreover, because any lost TikTok revenue would be very substantial (Fastly relied on TikTok for 13% of its revenues by 2Q20), at the time these statements were made, there was a substantial risk that Fastly could not quickly backfill the loss of TikTok revenue as promised and Defendants therefore had no reasonable basis to expect to meet the 3Q20 and FY 2020 guidance given.

Dkt. 73 at 21.

United States District Court
Northern District of California

1       The first representation, that defendants assumed "status quo" with regard to

2   TikTok, is fairly read in context as a truthful disclosure—business had not yet been cut off

3   with the Chinese company, and Fastly did not yet have a reason to restrict or terminate

4   traffic from its customer.  Plaintiff fails to plead a specific allegation of what defendants

5   knew at the time they made that representation, so there is accordingly no

6   misrepresentation on that point.  Moreover, Bixby warned that status quo traffic from

7   TikTok could not be guaranteed.  Dkt 70-19 at 11.

8       While plaintiff posits that other Fastly enterprise customers had begun lowering

9   their usage at the beginning of 3Q20, defendants emphasized the unpredictable nature of

10  revenues based on customers' usage, as well as the unpredictable Internet traffic

11  patterns created by the Covid-19 pandemic.  See "Risks Related to our Business and

12  Industry," Dkt. 70-17 at 17-35.  Plaintiff attacks the August statements for the failure to

13  disclose that TikTok had begun transitioning its traffic away from Fastly, but at no point

14  does plaintiff establish that this was known to defendants or when it became known to

15  them.  Plaintiff does not establish that this unsupported allegation signaled a trend rather

16  than a mere blip in Fastly's dynamic and unpredictable revenues, based on customers'

17  uncommitted use of Fastly's CDN services.  The media plaintiff cites regarding TikTok's

18  diversification of its traffic are thin on specifics and provide no information regarding a

19  specific reduction in TikTok's use of Fastly's services.  As defendants state, "Plaintiff's

20  reliance on unsupported hindsight speculation does not plead a misleading omission."

21  Dkt. 70 at 27; see also Welgus v. TriNet Grp. Inc., 2017 WL 6466264, at *11 (N.D. Cal.

22  Dec. 18, 2017).  And while plaintiff also alleges that the August statements were

23  misleading because Fastly failed to disclose a risk that the company would not be able to

24  backfill lost TikTok business, plaintiff fails to offer any particular fact to support that

25  defendants did not genuinely believe they could make up the lost business.  Plaintiff's

26  suggestions that other companies shifted their traffic away from Fastly and that TikTok

27  put constraints on Fastly's business are similarly unsupported by any particular facts.

28  Therefore, plaintiff fails to plead the falsity of the August 2020 statements.

### b.       Whether the Safe Harbor applies to shield the challenged statements

The PSLRA carves out a safe harbor from liability for statements that are identified as "forward-looking" and are "accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1)(A)(i).  A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues."  No. 84 Employer-Teamster Joint Council Pension Trust Fund, 320 F.3d at 936.  "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."  Cutera, 610 F.3d at 1112.  Alternatively, if a forward-looking statement is not identified as such or is unaccompanied by meaningful cautionary statements, then the statement is actionable only if the plaintiff proves that the forward-looking statement "was made with actual knowledge by that person that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B); see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1058 (9th Cir. 2014).  Statements, for example, touting contemporary status of a sales pipeline despite defendant corporate officers' awareness of negative trends in the pipeline are not forward-looking and are not protected by the safe harbor.  Intuitive Surgical, 759 F.3d at 1143-44.

Defendant identifies the following statements challenged by plaintiff as forward looking:

- Bixby's May 6 statement that "we raised guidance for the full-year 2020." (Compl. ¶¶ 53, 56);

- Bixby's statement that 2020 guidance was based on "expected 'continued customer expansion' due to increased internet traffic from social distancing measures [] to continue into Q2 and future periods" and as a result, Defendants "remain optimistic about the demand for our mission-critical

services" (Compl. ¶56);

- Lares' statement that Q2 guidance was based on his observation that enterprise customers "seem to be in good shape" and that he was "not seeing anything concerning from a sort of the Q2 perspective" (Compl. ¶ 59; Ex. 7 at 11);

- Lares' August 5 statement: "For the third quarter, we expect revenue in the range of $73.5 million to $75 million . . . For the full year 2020, we increased our revenue guidance range to $290 million to $300 million" (Compl. ¶ 76); and

- Defendants' statements that the guidance provided on August 5 assumed that TikTok's usage would remain "status quo" and that "we believe we are in a position to backfill the majority of [any lost TikTok] traffic" (Compl. ¶¶ 74, 77, 93).

Plaintiff resists the application of the safe harbor to these statements, suggesting that they describe present conditions.  However, these statements regarding future operations and economic opportunities are forward-looking on their face.  See 15 U.S.C. § 78u5(i) (forward-looking statements include any statement regarding "future economic performance" and the assumptions underlying those); see also In re Solarcity Corp. Sec. Litig., 274 F. Supp. 3d 972, 990 (N.D. Cal. 2017); (finding statements concerning future operations and economic opportunities forward-looking).

Contrary to plaintiff's argument that the statements were not accompanied by meaningful cautionary language, the cautionary language used by defendants is almost identical to language approved by the Ninth Circuit in instances in which forward-looking statements were immunized by the PSLRA safe harbor.  See, e.g., Intuitive Surgical, 759 F.3d at 1059-60 (approving cautionary language in earnings call that warned that comments may contain forward-looking statements, that such statements may differ based on "certain risks and uncertainties," and referring investors to "the company's [SEC] filings"); Cutera, 610 F.3d at 1112 (approving cautionary language at beginning of

United States District Court
Northern District of California

1    quarterly earnings call that the conversation would contain forward-looking statements

2    "concerning future financial performance and guidance," and that "Cutera's ability to

3    continue increasing sales performance worldwide could cause variance in the results.").

4    Defendants enumerate a plethora of specific risks, including those underlying plaintiff's

5    theory of fraud; for example, they warn Fastly "cannot guarantee [] usage levels" and any

6    "U.S. government prohibit[ion of] our current or potential customers from doing business

7    with us [could cause] our delivery of content by our platform [to] be blocked."  Ex. 5 at 20,

8    27 (Dkt. 70-6 at 12, 18).  These risk disclosures reach beyond mere boilerplate and

9    specifically warn against the very allegations advanced by plaintiff here.  Defendants'

10   cautionary language is therefore sufficient to bring the forward-looking statements into

11   the PSLRA safe harbor.

12        More substantially, all the statements fall within the second prong of the safe

13   harbor—plaintiff fails to establish they were "made with actual knowledge" of their falsity.

14   The general averments plaintiff makes regarding defendants' knowledge of the risks

15   faced by TikTok, along with the vague and speculative media reports identified in

16   support, are insufficient to establish at any point that defendants had actual knowledge

17   that TikTok would be banned by the U.S. government or how such a ban would take

18   shape to impact Fastly's business.

19                    c.        **Whether the statements are non-actionable statements of**

20                              **historical performance**

21        Defendants' growth projections, restating "[a]ccurately reported historical

22   information," are non-actionable.  Irving Firemen's Relief & Ret. Fund v. Uber Techs.,

23   2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018).

24        Defendant highlights the following statements from the May call:

25   •    Bixby: "We generated $63 million in revenue, up 38% year-over-year, and

26         increased our enterprise customer count to 297 from 288 in the previous quarter"

27         (Compl. ¶ 53);

28   •    Bixby: "These results were primarily driven by continued strong business

23

United States District Court
Northern District of California

1    fundamentals and further adoption of our edge cloud platform by enterprise

2    organizations across multiple verticals and geographies." (Compl. ¶ 53);

3    • Bixby: "We continued to drive expansion within our customer base with a DBNER5

4    of 133% . . ." (Compl. ¶ 53);

5    • Bixby: "For the first quarter, average enterprise customer spend increased to

6    $642,000 from $607,001 in the previous quarter" (Compl. ¶ 57); and

7    • Fastly: "We currently receive a substantial portion of our revenues from a limited

8    number of customers. For the trailing 12 months ended March 31, 2020, our top

9    ten customers accounted for approximately 31% of our revenue." (Compl. ¶ 63).

10   Plaintiff contests that these statements go beyond the mere recounting of historical

11   results.  He argues that where defendants touted enterprise customers as a positive

12   driver of these results, they had an obligation to disclose that TikTok, as the most

13   significant enterprise customer, was potentially facing a U.S. ban.  Plaintiff's assessment

14   is incorrect—these statements merely describe historical information that is non-

15   actionable.  But further, plaintiff's attempt to connect these statements to the potential

16   TikTok ban finds little support in the record.  Plaintiff largely fails to establish with any

17   level of certainty that defendants knew TikTok could potentially be banned in the U.S.

18   and when they knew it.  Therefore, absent more specific allegations that defendants

19   specifically knew the likelihood of a ban of TikTok within the U.S., these historical

20   statements are not actionable and do not support plaintiff's claim for securities fraud.

21              d.      **Whether the statements amount to non-actionable**

22                      **corporate puffery**

23        Plaintiffs challenge many statements in defendants' public reporting that

24   defendants argue constituted statements of corporate optimism.  Multiple courts have

25   held that statements of corporate puffery are not actionable.  See, e.g., Cutera, 610 F.3d

26   at 1111 (defendants' statement that "we believe our employee relations are good" was

27   not actionable, even though many employees were leaving the company, because

28   "[w]hen valuing corporations . . . investors do not rely on vague statements of optimism

24

like 'good,' 'well-regarded,' or other feel good monikers").  Courts in this district regularly find statements of corporate puffery to be non-actionable statements in the securities fraud context.  See, e.g., City of Royal Oak Retirement System v. Juniper Networks, Inc., 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (statements that company has "strong demand metrics and good momentum," and "our demand indicators are strong, our product portfolio is robust" were non-actionable statements of mere corporate optimism); In re Fusion-io, Inc., 2015 WL 661869, at *15 (statements that "we are well positioned to capture a significant share of the opportunity from enterprise to hyperscale over the next few years" and "we exited fiscal 2013 with a significantly more diversified customer and product base, which we believe provides a sound basis for business expansion going forward" were non-actionable).

However, broadly optimistic statements, taken in context, may still form a basis for a securities fraud claim when those statements "address specific aspects of a company's operation that the speaker knows to be performing poorly."  See Quality Systems, 865 F.3d at 1143; see also Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996) (telling investors FDA approval was "going fine" when the company knew approval would never come was materially misleading); Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995) (saying the company "anticipates a continuation of its accelerated expansion schedule" when the expansion already failed was misleading).

Plaintiff argues in substantial part, "Since Defendants identified 'customer demand' and 'enterprise customers' as key factors critical to Fastly's success (¶¶64-65, 116), they cannot later claim that concrete statements such as that they were seeing 'stronger demand' and that their enterprise customers 'seem to be in good shape' have no meaning to investors."  Dkt. 73 at 26.  Plaintiff's claim relies on the departure of TikTok from the Fastly CDN and TikTok's potential ban from the U.S. as facts contrasting the "good shape" suggested by defendants.  But such statements are different than those found misleading in Quality Systems.  See 865 F.3d at 1143 (reassuring investors that "'everything [was] going fine'" with FDA approval when the company knew FDA approval

United States District Court
Northern District of California

1   would never come was materially misleading).  Compared to the knowingly false

2   statements at issue in that case, plaintiff does not establish that defendants here knew

3   that TikTok was not in "good shape" at the time of those statements.  Even in context,

4   defendants' statements were not misleading because unlike Quality Systems, the

5   allegedly concealed facts had not yet transpired.  The statements generally referring to a

6   number of customers are not actionable because they are vague assessments that

7   "represent the 'feel good' speak that characterizes 'non-actionable puffing.'"  Intuitive

8   Surgical, 759 F.3d at 1060 (citing Cutera, 610 F.3d at 1111).  Plaintiff fails to plead their

9   falsity.

10              **2.      Scienter**

11        A complaint must "state with particularity facts giving rise to a strong inference that

12   the defendant acted" with scienter.  See 15 U.S.C. § 78u-4(b)(2)(A); Tellabs, 551 U.S. at

13   321.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."

14   Tellabs, 551 U.S. at 308; see also Metzler, 540 F.3d at 1061.  To demonstrate scienter, a

15   complaint must allege that the defendants made "false or misleading statements either

16   intentionally or with deliberate recklessness."  See Zucco, 552 F.3d at 991; Ronconi v.

17   Larkin, 253 F.3d 423, 432 (9th Cir. 2001).  In addition to the particularity considered

18   necessary for falsity, discussed above, "The Supreme Court has emphasized that courts

19   'must review all the allegations holistically' when determining whether scienter has been

20   sufficiently pled.  The relevant inquiry is 'whether all of the facts alleged, taken

21   collectively, give rise to a strong inference of scienter, not whether any individual

22   allegation, scrutinized in isolation, meets that standard.'"  Reese v. Malone, 747 F.3d

23   557, 569 (9th Cir. 2014) (citing Tellabs, 551 U.S. at 323).

24              **a.      Whether the complaint establishes that defendants had**

25                    **"direct knowledge" of the falsity of their statements**

26        Plaintiff points to the following allegations to contend that the defendants knew

27   facts "suggesting the statements were inaccurate or misleadingly incomplete" in May and

28   June 2020.  In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1022 (S.D. Cal.

2005).  First, defendants allegedly knew TikTok had become Fastly's largest customer, representing over 10% of the company's revenues.  Compl. ¶¶ 32-33, 68.  Second, defendants allegedly also knew the U.S. government was taking action against TikTok due to the fear that it posed a national security threat.  Compl. ¶¶ 118-120; see also ¶¶ 17-18, 22-31.  On this point, plaintiff highlights the investigation of CFIUS into TikTok as a national security threat and the U.S. Military's ban of TikTok on government-issued devices.  Compl. ¶¶ 62, 70, 72.  And on these bases, plaintiff avers "the disclosure of TikTok as Fastly's single largest customer was material to investors' understanding of the Company's business risk as a whole because of the escalating problems and increasing U.S. bans TikTok was facing just a few months before the Class Period."  Dkt. 73 at 29. On these points, plaintiff ignores the express disclosures defendants made in May, including this particular caution:

> If the U.S. government prohibits our current or potential customers from doing business with us, whether through policy, regulations or laws, we could face direct liability or our delivery of content by our platform may be blocked. For example, in the current environment of economic trade negotiations and tensions between the Chinese and U.S. governments, the U.S. government has expressed concerns about the ability of companies operating in China to do business in the U.S. or with U.S. companies. As a result, we could lose the ability to contract with current or potential customers, which could harm our business.

Ex. 8, Fastly Form 10-Q, May 8, 2020, at 55 (Dkt 70-9 at 24).  Contrary to the omission plaintiff seeks to emphasize throughout, defendants disclosed the risk faced.  Plaintiff's claim of the known falsity of not disclosing TikTok as a customer is additionally weakened by his own failure to specify the information defendants had and when.  Plaintiff fails to establish that defendants knew of serious risks associated with TikTok being Fastly's largest customer in May 2020 where he does not allege that defendants "saw specific reports," nor does he plead "references to specific reports and their contents," which informed them that their statements were false.  In re Solarcity Corp. Sec. Litig., 274 F. Supp. 3d, 972, 1012 (N.D. Cal. 2017).  The complaint does not establish that defendants had actual knowledge of the falsity of their statements in May 2020.

1    Plaintiff points next to the following allegations to contend that the defendants

2    knew the false and misleading nature of their August 2020 statements.  First, that

3    defendants knew, but failed to disclose, that TikTok was already removing traffic from

4    Fastly's platform to non-U.S. CDNs and was accelerating its own CDN deployment

5    because of the bans it was facing in the U.S.  Compl. ¶¶ 80, 82, 90, 96.  Second, that

6    defendants knew it would be difficult, if not impossible, to backfill the traffic TikTok was

7    removing from Fastly's platform because Fastly had a limited pool of customers that

8    could match TikTok's usage.  Compl. ¶¶ 80, 82, 90, 96.

9    On this set of statements/omissions as well, plaintiff does not allege that

10   defendants saw specific reports, that they had specific knowledge of TikTok's activities,

11   or that they knew that they could not backfill any lost business from a TikTok shut down.

12   Defendants' statements were forward-looking, and plaintiff therefore must establish that

13   defendants knew they could "never" meet the projections they laid out.  See Tesla, 985

14   F.3d at 1192.  Plaintiff does not allege with particularity that defendants knew TikTok's

15   usage would not remain "status quo" (¶ 77), and plaintiff does not allege that defendants

16   knew Fastly was not in a position to "backfill the majority of [any lost TikTok] traffic" (¶¶

17   74; 81).  Plaintiff's own description acknowledges that defendants knew it "would be

18   difficult, if not impossible, to backfill" lost TikTok business.  Dkt. 73 at 30.  These

19   allegations are insufficient to demonstrate that defendants knew the statements were

20   false when made, and they do not support a finding of scienter.

21           b.    **Whether the "core operations" inference supports finding**

22                 **scienter**

23   Under the core operations doctrine, a court can infer scienter if the fraud is based

24   on facts "critical to a business's core operations," such that the company's key officers

25   would know of those facts.  S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 783-84 (9th Cir.

26   2008) (internal quotation marks omitted).  Courts applying the core operations doctrine

27   have required plaintiffs to plead "details about the defendants' access to information

28   within the company" related to the fraud.  Id. at 785.  In Nursing Home Pension Fund,

Local 144 v. Oracle Corp., 380 F.3d 1226 (9th Cir. 2004), the plaintiffs relied on the core operations doctrine to demonstrate a CEO's scienter as to false statements regarding the company's sales, where the CEO stated that: "All of our information is on one database. We know exactly how much we have sold in the last hour around the world." Id. at 1231. However, finding scienter under the core operations doctrine "is not easy," and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports." Intuitive Surgical, 759 F.3d at 1062; see also Zucco, 552 F.3d at 1000 (finding "allegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter . . . and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter).

Here, plaintiff fails to identify facts supporting the core operations inference. First, there are no specific admissions by Bixby or Lares of detailed involvement in the minutia of the company's operations. Bixby's statement that he would "continue to monitor the [] situation" is insufficient to raise a strong inference of scienter where it is not accompanied by any specific allegations of what Bixby found out after making that statement. Compl. ¶ 117. Plaintiff relies on media reports to show defendants' knowledge of the risk of a TikTok ban and fails to make "detailed and specific allegations about management's exposure to factual information within the company." S. Ferry LP, No. 2, 542 F.3d at 784-85. There are simply not enough specific allegations regarding what was known inside the company and when to support this rare inference of scienter. Id. at 784 ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard."). Second, in contrast to Intuitive Surgical, there are no witness accounts demonstrating that Bixby or Lares were involved in creating false reports. See 759 F.3d at 1062. Plaintiff's pleading falls short of the core operations inference and does not support a finding of scienter.

1

2

### c.    Whether allegations regarding defendants' motives
### support a finding of scienter

3      Plaintiff alleges defendants were motivated to mislead investors on two bases:

4  (1) the insider trading of Bixby and Lares, and (2) the public stock offering to fundraise for

5  an acquisition of Signal Science.  For both reasons, plaintiff contends, defendants were

6  motivated to conceal the company's reliance on TikTok to keep Fastly's stock price

7  artificially inflated.

8      "Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute

9  circumstantial evidence of scienter, insider trading is suspicious only when it is

10  'dramatically out of line with prior trading practices at times calculated to maximize the

11  personal benefit from undisclosed inside information.'"  Zucco Partners, LLC, 552 F.3d at

12  1005 (quoting Silicon Graphics, 183 F.3d at 986).  Courts must consider three factors to

13  determine if stock sales constitute circumstantial evidence of scienter: "(1) the amount

14  and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the

15  sales were consistent with the insider's prior trading history."  Id. at 1005.

16      Here, plaintiff alleges that "Bixby sold 276,030 shares of his personally held shares

17  of Fastly stock, about 34% of his total holdings in Fastly, for proceeds of $18,140,479.  In

18  the 161 days immediately preceding the Class Period, by contrast, Bixby sold just

19  110,000 shares for approximately $2.3 million.  Thus, Bixby sold about 2.5 times as many

20  shares during the Class Period than in his prior trading."  Compl. ¶ 130.  Plaintiff alleges

21  "Lares sold 57,682 shares of his personally-held shares of Fastly stock, almost 9% of his

22  total Fastly holdings, for proceeds of $3,983,103.  In the 161 days immediately preceding

23  the Class Period, by contrast, Lares sold just 25,000 shares for $536,730.  Thus, Lares

24  sold about 2.3 times as many shares during the Class Period than in his prior trading."

25  Compl. ¶ 131.  These stock sales, particularly in light of the percentage comparison for

26  the 161-day period preceding the class period, are clearly more but not dramatically out

27  of line with the officers' prior trading practices.  Moreover, these sales do not appear to

28  be calculated to maximize the personal benefit from undisclosed inside information where

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Bixby and Lares were in less control of the timing of the sales.

2    Defendants' stock sales were all made to either satisfy tax obligations or according

3    to a 10b5-1 plan.  Exs. 25 and 24 (Dkt. 70-26 and 70-27).  See Curry v. Yelp. Inc., 875

4    F.3d 1219, 1226 n.2 (9th Cir. 2017) (explaining "stock sales made pursuant to a Rule

5    10b5-1 plan . . . allows for stock sales over a predetermined period without concern for

6    the market."); Metzler Inv. GMBH v. Corinthian Colleges, 540 F.3d 1049, 1067 n.11 (9th

7    Cir. 2008) ("Sales according to pre-determined plans may rebut [ ] an inference of

8    scienter.") (internal citations omitted).  While plaintiff argues at length that the 10b5-1

9    plans are not determinative on the issue of scienter, the timing of these planned sales is

10   relevant to the second prong of the assessment described above.  Defendants did not

11   have immediate control over these planned sales, so these sales, made without concern

12   for the market, cut against a finding of scienter.  The court finds that defendants' stock

13   sales do not support a strong inference of scienter.

14   Plaintiff argues that scienter should be inferred because defendants were

15   motivated to maintain the Fastly stock price artificially high to maximize returns from a

16   stock offering and to support acquisition of another company.  Dkt. 73 at 31.  The Ninth

17   Circuit has generally rejected motive allegations to support scienter where they are

18   premised on "routine corporate objectives such as the desire to obtain good financing

19   and expand."  Webb v. Solarcity Corp., 884 F.3d 844, 856 (9th Cir. 2018); see also In re

20   Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 884 (9th Cir. 2012) ("allegations of routine

21   corporate objectives such as the desire to obtain good financing and expand are not,

22   without more, sufficient to allege scienter; to hold otherwise would support a finding of

23   scienter for any company that seeks to enhance its business prospects.").  Plaintiff's

24   allegations fall short where they fail to reach past defendants' routine expansion

25   objectives.  Defendants' shared motivation to raise capital does not support a

26   determination of scienter.

27   d.    Whether the allegations of scienter fail holistically

28   The court must also "consider the complaint in its entirety" to determine if "all of

31

1   the facts alleged, taken collectively, give rise to a strong inference of scienter" that is "at

2   least as compelling as an alternative innocent explanation." Tellabs, 551 U.S. at 322-23;

3   Zucco, 552 F.3d at 1006.

4   　　　Here, the facts do not give rise to an inference of scienter that is at least as

5   compelling as the inference of an honest mistake. See Tellabs, 551 U.S. at 314.  At no

6   point in his pleading does plaintiff establish that defendants knew their representations to

7   investors were false.  At the beginning of the Class Period, Fastly identified and shared

8   the risks that could cause the company to lose business.  These risk disclosures included

9   that the U.S. government could pass laws impacting Fastly's substantial revenues from

10  international customers, especially those in China.  Plaintiff fails to allege a single fact

11  suggesting either Bixby or Lares believed there was any real risk President Trump would

12  ban TikTok prior to August.  When the regulatory situation changed in August, Fastly

13  disclosed TikTok as a significant customer.  Plaintiff fails to establish that defendants

14  knew they could not backfill lost TikTok business as they opined in August.  Defendants

15  subsequently announced their expectation that Fastly would miss its earlier revenue

16  projections and withdrew its 2020 guidance, before its third quarter results were finalized

17  and before it was obligated to so announce.  As defendants offer, "Fastly consistently

18  went to the market with information as it became aware, and *sooner* than required."  Dkt.

19  70 at 33.  Plaintiff's theory of scienter relies on defendants' withholding of key information

20  regarding the risks faced by and posed by TikTok, but plaintiff does not establish that

21  plaintiffs ever had that information.  Therefore, there are insufficient allegations to support

22  a finding of scienter.

23  　　　　　　**3.　　　Second Cause of Action – § 20**

24  　　　Congress established liability in § 20(a) for "[e]very person who, directly or

25  indirectly, controls any person liable" for violations of the securities laws.  15 U.S.C. §

26  78t(a).  To establish a prima facie case under § 20(a), a plaintiff must prove: (1) "a

27  primary violation of federal securities law;" and (2) "that the defendant exercised actual

28  power or control over the primary violator."  Howard v. Everex Sys., Inc., 228 F.3d 1057,

1065 (9th Cir. 2000).

Because plaintiff has failed to plead a primary securities law violation, plaintiff has also failed to plead a violation of § 20(a).  See Cutera, 610 F.3d at 1113 n.6 (holding that § 20(a) claim was properly dismissed because § 10(b) claim had already been dismissed).

## IV.    CONCLUSION

For the foregoing reasons, including plaintiff's failure to plead the falsity of defendants' representations or scienter, the court rules as follows.  The court GRANTS defendants' request for judicial notice as detailed above.  The court GRANTS defendants' motion to dismiss plaintiff's amended complaint with leave to amend.  Plaintiff shall have 28 days from the date of this order to file a second amended complaint to cure the deficiencies noted in this order.  No new claims or parties may be added without leave of court or the agreement of all parties.  Upon the filing of any amended complaint, plaintiff must also file a redline clearly demarcating its changes from the existing complaint.

**IT IS SO ORDERED.**

Dated: November 28, 2021

*/s/ Phyllis J. Hamilton*
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California

33